**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

YOLANDA TRIANA, also known as
Yolanda Jean Rodriguez,

Defendant - Appellant.

No. 06-7054

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 05-CR-74-S)**

---

J. Lance Hopkins, Tahlequah, Oklahoma, for Defendant - Appellant.

Gregory Dean Burris, Assistant United States Attorney, (Sheldon J. Sperling,
United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff
- Appellee.

---

Before **BRISCOE**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

A jury found Yolanda Triana guilty on one count of possession with intent

to distribute more than 50 grams of methamphetamine, *see* 21 U.S.C. § 841(a)(1)

and (b)(1)(A)(viii), and one count of possession of a firearm in furtherance of a

drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A)(I) and (c)(2). She was sentenced in the United States District Court for the Eastern District of Oklahoma to consecutive terms of 121 months' imprisonment on the drug count and 60 months on the firearm count. She appeals her conviction, contending that there was insufficient evidence that she possessed the drugs or a firearm, and that the district court erred in defining *deliver* in a jury instruction. We have jurisdiction under 28 U.S.C. § 1291; we reject her contentions and affirm her conviction.

## I. BACKGROUND

On July 25, 2005, Oklahoma Highway Patrol Trooper Scott Miller noticed a PT Cruiser convertible going 92 miles per hour on Interstate 40. He stopped the vehicle and asked the driver for his license and proof of insurance. The driver (later identified as Ricardo Callirgos-Navetta) was unable to produce the requested documents. Because it was difficult to converse over the highway noise and dangerous to stand on the side of the road, Miller asked Mr. Callirgos-Navetta to accompany him to his patrol car.

Once Mr. Callirgos-Navetta entered the patrol car, Trooper Miller told him to sit tight and he returned to the PT Cruiser. He asked the passenger, Ms. Triana, for her license. She told him that Mr. Callirgos-Navetta had never had a license, and gave him hers. Miller went back to his patrol car and asked Mr. Callirgos-Navetta who owned the car that he was driving, where they were going, and where they had been. He responded that they had been in California to

-2-

visit his daughter, and that the car was a rental. Miller went to the PT Cruiser to get the rental agreement from Ms. Triana, but she was unable to find it. When Miller asked her where they were coming from, she responded that they were returning from Albuquerque, New Mexico, where they had been to visit her daughter. He again went to the patrol car and questioned Mr. Callirgos-Navetta further in an attempt to reconcile their conflicting accounts. Mr. Callirgos-Navetta, however, only elaborated on his prior account, contradicting himself on occasion as he did so.

Suspicious that the couple was engaged in illegal activity, Trooper Miller radioed for a K-9 drug-detection unit. He then issued Mr. Callirgos-Navetta a citation for speeding and a warning for driving without a license. After telling him that he was free to go, however, Miller asked Mr. Callirgos-Navetta whether he would first answer a few questions. He agreed. Miller asked him whether he had anything illegal in the car and whether he would consent to a search of the vehicle. Mr. Callirgos-Navetta replied that Miller would have to get permission from Ms. Triana, as it was not his car. Ms. Triana initially declined to give permission, so Miller informed her that he had called for a drug dog to sniff around the car because her story and Mr. Callirgos-Navetta's did not match up. She then said that he could search the car, but he replied that it was too late for that. He asked her to join Mr. Callirgos-Navetta in his patrol car while they awaited the dog. Miller left them alone in his car. The patrol car was equipped

-3-

with a video camera and an audio recording system. The video camera was mounted inside on the windshield and pointed forward; the audio recording system had two microphones, one on Miller and one inside the patrol car.

Unaware that they were being recorded, Mr. Callirgos-Navetta and Ms. Triana discussed their situation. Although Ms. Triana's counsel argues that most of the recorded audio is unintelligible, our review reveals that a large part of what Ms. Triana and Mr. Callirgos-Navetta say while in the patrol car can be understood. Shortly after Trooper Miller left the patrol car, Ms. Triana reprimanded Mr. Callirgos-Navetta for speeding, and he said he was sorry. She asked, "You're sorry what, that I'm going to go to jail?" R. Add. at 19:48:16. They argued about why he had said that they had been to California rather than saying that they had gone to Albuquerque. Ms. Triana told him that she had "that shit in my pants," *id*. at 19:48:48, to which he replied, "Do you have it on you?" *Id*. at 19:49:02. Their conversation turned to the upcoming dog search, and Ms. Triana said, "He's going to smell that in the bag." *Id*. at 19:51:48. She also told him, "You didn't help me pack the car . . . if they open the trunk." *Id*. at 19:51:55-52:15.

Trooper Darren Koch and his partner, Trooper Ty Owens, who had arrived with the drug dog shortly after Ms. Triana entered the patrol car, took the dog to the convertible. Ms. Triana and Mr. Callirgos-Navetta continued to converse while they watched Koch and his dog circle their vehicle. When the dog

-4-

approached the rear of the car, Ms. Triana said, "If he gets near that corner, that's where it is." *Id*. at 19:53:38. As the dog rounded the back right corner of the car, where the drugs were eventually found, Ms. Triana said, "Keep going doggy, keep going." *Id*. at 19:53:41. The dog alerted to the presence of drugs in the vehicle.

One of the troopers asked Ms. Triana and Mr. Callirgos-Navetta whether they had a personal-use quantity of drugs in the car. They denied having drugs but Ms. Triana told the trooper that there was a gun under the driver's seat. The troopers then began a search of the vehicle. During the search Ms. Triana said to Mr. Callirgos-Navetta, "If they find anything, they planted it." *Id*. at 19:57:41. The troopers found a gun and a silver briefcase in the passenger compartment. When Mr. Callirgos-Navetta asked Ms. Triana what was in the briefcase, she replied that it contained other guns. Unable to open the briefcase, a trooper asked Mr. Callirgos-Navetta for the combination. He replied that it wasn't his; the trooper then asked Ms. Triana the same question. She gave him the combination, stating, "It's 006, or 007." *Id*. at 20:03:06-10. The troopers opened the briefcase and found two more guns inside.

Two troopers continued to examine the contents of the briefcase while the third moved to the trunk and opened it. He began removing things from the corner where the dog had alerted. As he did so, Ms. Triana said, "We're dead." *Id*. at 20:03:56. When the trooper removed a black backpack, Ms. Triana became audibly upset and exclaimed, "Oh, please no, there it is Rick!" *Id*. at 20:04:08.

She then cried, "Who's gonna help me, Rick?" *Id*. at 20:04:09. The backpack contained 432.39 grams of methamphetamine. The trunk also contained drug paraphernalia, including ziplock baggies, scales, and glass pipes, and an open bag of coffee intended to mask the smell of the drugs.

Having found the drugs in the trunk, Trooper Koch asked Ms. Triana to step out of the patrol car. As she exited, a glass pipe fell from her pocket to the ground. She then removed a black pouch from her pants, saying, "What you want is right here," R. Vol. 3 at 48, and handed it to Koch. About three grams of methamphetamine were found in a lip-gloss container inside the pouch that she had removed from her pants.

Troopers Miller and Koch testified to the above events at trial. Also, the video of the stop was shown to the jury. Ms. Triana testified as follows: She lived in Fayetteville, Arkansas, and she and Mr. Callirgos-Navetta had been together in a common-law marriage for 17 years. She had been planning to take her 15-year-old son with her to Albuquerque, New Mexico, where her daughter (who lived in California) would meet them for a visit. Mr. Callirgos-Navetta was fired from his job and decided to join her at the last minute. (It is evident from the video of the stop that her son did not join them on the trip.) Upon arrival in Albuquerque, Ms. Triana, her daughter, and her grandchildren went shopping without Mr. Callirgos-Navetta. When they returned that evening to their motel, he was not there. He did not return that night, and she did not know where he

-6-

was. After he returned the next day, he did not disclose where he had been. He and Ms. Triana went to a store that sold drug paraphernalia, and purchased baggies, glass pipes, and a scale. They then left Albuquerque. They stopped at a motel in Amarillo, Texas, where Mr. Callirgos-Navetta emptied on the nightstand the contents of a black pouch in which he kept personal items and some methamphetamine, which they both used. Mr. Callirgos-Navetta had pressured her into using drugs at times, but she never asked him about his drug-dealing business. Although he could at times be very nice, he was controlling and on occasion had physically abused her to the point that she feared for her life.

Regarding the traffic stop, she testified that when they were being pulled over, Mr. Callirgos-Navetta had shoved the black pouch into her shorts and told her that in the trunk he had "shit," which she understood to be methamphetamine. R. Vol. 3 at 146. She said that this was the first she knew about there being any drugs in the car other than those in the black pouch. As for the guns, she testified that although she had purchased them, they belonged to Mr. Callirgos-Navetta. When asked on cross-examination about her statement to Mr. Callirgos-Navetta on the video that "[y]ou didn't help me pack the car," she said that she was referring only to the car's interior and was trying to transfer responsibility to herself from Mr. Callirgos-Navetta, a convicted felon, for possession of the guns because she did not think that she faced any liability for possessing them. She

also explained that the reason she had become agitated when the troopers began searching the trunk was that there were items in it that she did not want seen.

Mr. Callirgos-Navetta also testified at trial. When asked about the trip, he gave a story different from Ms. Triana's. He said that Ms. Triana had been nagging him that she wanted to see her grandchildren. Because he was already going in that direction, he decided to take her with him. The purpose of his trip was to pick up methamphetamine in California for distribution. Once they arrived in Albuquerque, he took the car and left Ms. Triana with their daughter. Without telling Ms. Triana where he was going, he drove to California to obtain a package that he put in a backpack. On his return to Albuquerque, he picked up Ms. Triana, who did not ask where he had been. Mr. Callirgos-Navetta further testified that on the trip he had been carrying a black pouch containing his personal drugs. When they were being pulled over, he grabbed the pouch and stuck it in her pants. He then told her that he had "some stuff" in the trunk, R. Vol. 3 at 210; this was the first he had told her about the drugs in the trunk.

With respect to Count One (the drug-possession charge), the district court instructed the jury that to convict Ms. Triana it had to find that she had possessed the controlled substance knowingly and intentionally with the intent to distribute it. It defined *distribute* as "to deliver a controlled substance." R. Vol. 1 Doc. 47 at 16. About 90 minutes after the jury retired to deliberate, it sent a note to the court asking, "Could we please have a definition of delivering?" R. Vol. 4 at 302.

The court advised counsel that it intended to comply with the request. Although both the prosecutor and defense counsel objected, the court gave the jury a supplemental instruction stating, "The term 'deliver' means to yield possession or control of something to another." R. Vol. 1 Doc. 47 at 17. It also told the jury that it should "be guided by all of the instructions" already given as well as the supplemental instruction. R. Vol. 4 at 309. The jury reached its verdict about two and a half hours later.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

Ms. Triana contends that the evidence was insufficient for the jury to find her guilty of either the methamphetamine or the firearm offense. We review the sufficiency of the evidence de novo. *See United States v. Platte*, 401 F.3d 1176, 1180 (10th Cir. 2005). We "ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant[] guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

#### 1.  Possession of Drugs

To sustain Ms. Triana's conviction for possession with intent to distribute, the evidence must prove that she (1) knowingly possessed the illegal drug, and (2) did so with the intent to distribute it. *See United States v. Reece*, 86 F.3d 994,

996 (10th Cir. 1996). "Possession may be either actual or constructive; constructive possession may be found if a person knowingly has ownership, dominion, or control over the narcotics and the premises where [they] are found. . . . [W]hen the contraband may be attributed to more than one individual, constructive possession requires some nexus, link, or other connection between the defendant and the contraband. The jury may draw reasonable inferences from direct or circumstantial evidence, yet an inference must amount to more than speculation." *Id*. (citations and internal quotation marks omitted). "[A] jury may infer intent to distribute from the possession of large quantities of drugs." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1131 (10th Cir. 2004).

Ms. Triana argues that she could not be convicted of the drug offense because (1) Mr. Callirgos-Navetta, not she, exercised dominion and control over the drugs found in the trunk and he was the one who was going to distribute them; and (2) the drugs in the pouch found on her person belonged to him and were for his personal use, not distribution. We are not persuaded.

Ms. Triana relies on *Reece*, in which we reversed the defendant's conviction for possession with intent to distribute because the "evidence fail[ed] to link [him] to the narcotics in any way other than presence and proximity, let alone show his intent to sell." 86 F.3d at 996. Mr. Reece was driving the car in which his codefendant was riding when they were stopped by a police officer. Drugs were found on the codefendant, but not on Mr. Reece, nor elsewhere in the

car. *See id.* We stated that the only evidence that could possibly link Mr. Reece to the drugs was a statement recorded while he and his codefendant waited in a patrol car. *See id.* The statement indicated his knowledge of the drugs, but by the time it was made, the codefendant had told Mr. Reece about the drugs. *See id.* It was therefore insufficient to establish the required nexus between Mr. Reece and the drugs. *See id.*

We find *Reece* readily distinguishable. Unlike the defendant in *Reece*, who had no drugs on his person, Ms. Triana was carrying the drugs in the black pouch at the time of the stop. Her knowledge of their presence was demonstrated by her statement "I have that shit in my pants," R. Add. 19:48:48, and her later voluntary surrender of the pouch to the trooper. The jury was not required to credit her argument that the drugs in the pouch belonged to Mr. Callirgos-Navetta and that she did not have dominion or control over them.

More important is the evidence of her connection to the drugs in the trunk: After Mr. Callirgos-Navetta apologized to her while they sat in the patrol car, she asked him, "Sorry what, that I'm going to go to jail?" *Id.* at 19:48:16. While waiting for the dog, she feared that it was "going to smell that in the bag." *Id.* at 19:51:48. When the dog approached the trunk, she said, "If he gets near that corner, that's where it is," *id.* at 19:53:38, and "Keep going doggy, keep going," *id.* at 19:53:41. As the officer opened the trunk, she said, "We're dead," *id.* at 20:03:56; and as he removed the backpack containing the drugs, she said, "Oh,

-11-

please no, there it is Rick," *id*. at 20:04:08, and "Who's gonna help me Rick?" *Id*. at 20:04:09. Although Mr. Callirgos-Navetta testified that the drugs were his and that she did not know about them, the jury was not required to believe him. We note that the jury could reasonably have determined from the tone and substance of the audio recording that Ms. Triana, not Mr. Callirgos-Navetta, was the dominant person in their relationship. We "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *See United States v. Cui Qin Zhang*, 458 F.3d 1126, 1128 (10th Cir. 2006) (emphasis and internal quotation mark omitted). It was eminently reasonable to find that Ms. Triana knowingly possessed all the drugs found in the convertible.

Having determined that the evidence was sufficient to show that she possessed the drugs, we have little difficulty in further determining that the evidence was sufficient to show that Ms. Triana intended to distribute them. Not only was the quantity of drugs found in the backpack large enough for the jury to infer intent to distribute, *see Pulido-Jacobo*, 377 F.3d at 1131, but the scales, glass pipes, and ziplock baggies—so called "tools of the drug trade"—were further evidence from which the jury could infer an intent to distribute. *United States v. Miller*, 84 F.3d 1244, 1255 (10th Cir. 1996), *overruled on other grounds by United States v. Holland*, 116 F.3d 1353 (10th Cir. 1997). Whoever possessed the drugs had more in mind than just personal use.

### 2. Possession of Firearms

Ms. Triana was convicted of violating 18 U.S.C. § 924(c)(1)(A), which prohibits using or carrying a firearm "during and in relation to any . . . drug trafficking crime" or possessing a firearm "in furtherance of any such crime." Her specific challenge to the conviction is that there was insufficient evidence that she possessed the guns found in the PT Cruiser. We disagree. She admitted that she had purchased the guns (because it was unlawful for Mr. Callirgos-Navetta to do so), and that she had rented the car in which they were found. She told the officers that there was a gun under the seat. When Mr. Callirgos-Navetta asked her what was in the briefcase, she told him that it contained other guns. She, not Mr. Callirgos-Navetta, gave the troopers the combination to open the briefcase. The jury could rationally infer that Ms. Triana possessed the guns found in the car.

## B.    Jury Instruction

Ms. Triana contends that the district court committed reversible error when it gave the jury an instruction defining the term *deliver* as "to yield possession." She argues that the court either should not have given a definitional instruction or should have used in the definition a word such as *give*, rather than *yield*, to indicate "an affirmative act" of transferring possession. Aplt. Br. at 23. "We review a district court's decision to give a particular jury instruction for an abuse of discretion and consider the instructions as a whole de novo to determine

-13-

whether they accurately informed the jury of the governing law." *United States v. Gwathney*, 465 F.3d 1133, 1142 (10th Cir. 2006).

The definitional instruction did not misstate the law, at least in the context of this case. We fail to see how omission of the instruction, or providing a definition using *give* rather than *yield*, could have affected the jury's ultimate finding of Ms. Triana's guilt on the possession-with-intent-to-distribute count. At oral argument on appeal her counsel urged that because the definition given by the court was passive ("yield"), it was easier for the jury to find that Ms. Triana was guilty of possession with intent to distribute than it would have been had the definition included the more active word "give." "Give," in his view, would have required the jury to find that Ms. Triana had taken an active role in the drug-distribution activity, rather than merely having been a passenger in the car where the drugs were found.

But if the jury had found that Ms. Triana was a mere passenger, with no responsibility for the drugs, it would have acquitted her because she did not *possess* the drugs. And if she is arguing that she would not be guilty of possession with intent to distribute just because someone else (Mr. Callirgos-Navetta?) would be the one who personally distributed her drugs (i.e., she would "yield" them to him for distribution), she is simply wrong. One who has joint possession of drugs with the intent that someone else actually handle the distribution is guilty of possession with intent to distribute. The law does not

-14-

permit a willing participant in crime to escape liability by keeping her hands clean. As the jury was instructed, one is guilty as an aider or abettor if she "willfully associate[s] herself in some way with the criminal venture, and . . . willfully participate[s] in it as in something she wishes to bring about, and . . . willfully seeks by some action of hers to make it succeed." R. Vol. 1 Doc. 47 at 23–24; *see United States v. Anderson*, 189 F.3d 1201, 1207 (10th Cir. 1999). We can see no basis for acquitting Ms. Triana that could have turned on the use of *give* rather than *yield* in the district court's instruction. Therefore, we need not speculate whether in some other case the use of the word *yield* could mislead a jury into reaching an improper verdict.

## III. CONCLUSION

Ms. Triana's conviction is AFFIRMED.