**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TUYEN VU NGO,

Defendant-Appellant.

No. 06-6244
(D.C. No. 05-CR-168-L)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **McKAY**, and **GORSUCH**, Circuit Judges.

In March 2006, defendant Tuyen Vu "Allen" Ngo[1] was convicted of one

count of possession with intent to distribute MDMA or ecstasy,[2] a controlled

substance, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]      Defendant was known as Allen or Alan Ngo. Tr. at 157, 178, 286.

[2]      Methylenedioxymethamphetamine is also known as MDMA or ecstasy. Tr. at 340.

18 U.S.C. § 2, and one count of conspiracy to possess with intent to distribute MDMA or ecstasy, in violation of 21 U.S.C. § 846. He was sentenced to 240 months on each count, with the sentences to run concurrently. He appeals from his convictions, arguing that the evidence was insufficient to support the verdict. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

### Summary of the Evidence Presented at Trial

Defendant and the other three men arrested with him for drug trafficking, Eric Hsiung, Eric Chen, and Richard Kim, lived in the vicinity of Los Angeles, California. See Tr. at 181, 256, 273-74, 277-78. Hsiung testified that he was twenty-one years old at the time of defendant's trial. Id. at 277. He had been friends with Chen since high school or college and also had known Kim that long, although they were not close friends. Id. at 277, 308. Hsiung moved into an apartment with Chen and Kim in August 2005. Id. at 278. He noticed that they seemed to have a lot of money to buy extravagant things, even though neither of them was working. Id. at 280. Chen and Kim bragged to Hsiung about the amount of money they were making in the drug-delivery business. Id.

On August 22, 2005, Kim approached Hsiung and asked him if he wanted to make some "serious money," as his organization was short one person. See id. at 281-82, 312. Kim told Hsiung that they used a "team of four" and took two cars–one to carry the controlled substance and the other following behind to

-2-

distract the police–hitting the police car if necessary. Id. Kim said that the organization needed four drivers so that they could drive to their destination and back non-stop. Id. at 282-83. Hsiung agreed to make the trip for $3000. Id. at 285.

Hsiung testified that the next night, Kim received a call on his cell phone, and he, Kim, and Chen began packing for their drug run. Id. at 284. They drove to a Los Angeles suburb called Monterey Park and parked behind a large Ford pickup truck with a bed cover. Id. at 284-85, 318. Hsiung was told to get in the front passenger seat of the truck. Id. at 285. The drugs were in the back of the truck. Id. at 293-94. A few minutes later, a Honda Accord drove by, and Hsiung, Chen, and Kim drove to a gas station across the street. Id. at 285-86. Defendant was there, in the Accord. Id. at 287. Defendant later told Hsiung that he was getting paid between $1700 and $2000 to make the trip. Id. at 304-05.

Chen and Hsiung took turns driving the truck and defendant and Kim took turns driving the Honda. Id. at 288. Chen had a piece of paper marked with the route and the exits they were supposed to take. Id. at 291. Chen also had a cell phone to call the other car, using programmed numbers. Id. at 289-90. Hsiung was told not to socialize with defendant, however, because "[t]his is his business," and Chen and Kim did not want Hsiung to give any personal information about himself to defendant. Id. at 289; see also id. at 324. The four

men kept in contact so they would know how low each vehicle's fuel was. Id. at 302.

After about six or seven hours of driving through the night, id. at 298, they reached Flagstaff, Arizona, and Hsiung realized that there was a mechanical problem with the truck–the left front axle was broken, id. at 292. Both vehicles stopped, and "the first thing that [Chen and Kim] wanted to do was unload the controlled substance that was in the back of the truck and put it in the Accord, which they did." Id. at 293-94. Kim and Chen unloaded a large duffle bag from the truck and put it in the Honda. Id. at 294.

Chen stayed with the truck, and Kim, Hsiung, and defendant rode in the Accord to a motel. Id. at 295. Kim rented a room and left the duffle bag there with defendant for five to seven hours. See id. at 295-96, 298. Kim never left Chen or Hsiung alone with that bag. Id. at 295. At some point, someone made a phone call, id. at 321, and Kim and Hsiung returned to the truck. Five to seven hours later, a Lincoln Navigator arrived. Id. at 298. It was driven by a man called "Tim," id. at 299, but the car was later determined to be registered to and insured by defendant's brother, Tuyen Quan Ngo, id. at 268-70. When Kim and Chen attempted to get the spare tire out of the back of the truck, they found a second, smaller bag they had not located in the dark the night before. Id. at 299-300. Kim and Chen loaded the second bag in the Lincoln, and Kim, Chen, Hsiung, and Tim went back to the motel room. Id. at 299-300. Eventually, Kim

-4-

and Chen loaded the first duffle bag in the Lincoln, too. Id. at 300, 323-24. Kim, Chen, Hsiung, and defendant left "Tim" and the truck behind and continued their drug run with Kim and defendant in the Honda, and Chen and Hsiung in the Lincoln. See id. at 301. They continued to take turns driving, as before. Id.

As the group drove through the mountains, they had trouble communicating between the cars over their cell phones. Id. at 302. As a result, they bought hand-held radios (walkie-talkies) at a gas station. Id. at 302. Defendant, as well as the other men, took turns communicating between the vehicles, using the walkie-talkies. Id. at 302.

On August 25, 2005, defendant and the other three men were driving through Oklahoma on Interstate 40 (I-40). See id. at 145, 302. Four agents of the Oklahoma Bureau of Narcotics (OBN) were patrolling I-40 in Canadian County. Id. at 150. OBN Special Agent Troy Wall testified that he had received special training in recognizing the factors that distinguish narcotics traffickers from lawful drivers. Id. at 140-44. As he traveled eastbound, he saw the Honda following the Lincoln too closely, which was not only a traffic violation, but also an indication that the drivers might be employing a "tandem driving" technique used by drug couriers. Id. at 143–45, 146. In "tandem driving," an escort or decoy vehicle is used to distract law enforcement from the "load" vehicle–the vehicle with the illegal drugs or other contraband in it–by committing obvious traffic violations. Id. at 143-44.

Agent Wall testified that he pulled his OBN marked unit alongside the Honda and the Lincoln to observe them. Id. at 145-46. He noticed that both cars had California license plates, a state known to be a source of narcotics coming into Oklahoma. Id. at 141, 145-46. He also saw that the Lincoln had a frame around the license plate, which is a violation of Oklahoma law. Id. at 146. He thought that the occupants of both cars acted peculiarly, as they all stared straight ahead instead of acknowledging the police car, and the Honda made no attempt to back off from the Lincoln to correct its obvious violation. Id. at 146-47. Agent Wall concluded that the two cars were traveling together and thought it unusual that they would take two cars when the Lincoln–a large sport utility vehicle–was big enough for four people. Id. at 147. Having an extra car was also consistent with "tandem driving," and he decided to pull over the Lincoln for the tag violation. Id. at 147-48, 152.

Agent Wall attempted to pull his car between the Honda and the Lincoln, turning on his rear emergency lights as a signal, but the Honda did not slow down. Id. at 148-49. Agent Wall forced his way in between the two cars, turning on his front emergency lights to pull over the Lincoln. Id. at 149. At that time, the Honda swerved and accelerated around Agent Wall's car, missing his rear bumper by a few feet. Id. at 149. The Honda traveled alongside the Lincoln for a short while, and it appeared to Agent Wall that the occupants were attempting to communicate. Id. The Honda then sped away. Id. As Agent Wall pulled the

Lincoln over, he made an open call to the other OBN agents to stop the Honda if they saw it. Id. at 150-51.

When the window of the Lincoln was rolled down, Agent Wall smelled burnt marijuana. Id. at 151. Hsiung was driving the Lincoln at that time. Id. Agent Wall asked for his driver's license, and Hsiung told him it was in the Honda. Id. Agent Wall then spoke with Hsiung and Chen separately. Hsiung said that he, Chen, and the occupants of the Honda, whom he named as Richard Kim and Allen Ngo, were friends of his who were traveling together to Oklahoma City to drop off the Honda with Kim's uncle and then returning to Los Angeles. Id. at 152-53, 157. He later said that the group was traveling on to Illinois from Oklahoma. Id. at 157. He said that Chen owned the Lincoln. Id. at 154. Chen, in contrast, first told Agent Wall that the group was traveling to Oklahoma City to visit a friend of a friend, and then he said Kim's uncle, but he did not say anything about dropping off a vehicle before returning to Los Angeles or going to Illinois. Id. at 153. He denied owning the Lincoln. Id. at 154, 157.

Meanwhile, the Honda had turned around at the next exit and headed back westbound, and then turned around again to resume going eastbound. OBN Agent Ronnie Jackson stopped it. Id. at 156, 202-03. Kim had been driving the Honda. Id. at 205. The insurance verification on the car showed a first name of "Timothy" and a last name that Agent Jackson did not know how to pronounce. Id. at 210. Kim said that the Honda belonged to a friend he had known for a

-7-

couple of years, but he did not know Timothy's last name. Id. at 211-12. Defendant was a passenger in the Honda at that time. Id. at 207-08. Agent Jackson subsequently searched the Honda and found no ecstasy. Id. at 212-13. He spoke with each of the occupants separately. Kim told Agent Jackson that he and defendant were traveling to Dallas for a wedding–but not with any other persons or vehicles. Id. at 206-07. Defendant told Agent Jackson, "I think we're going to Dallas to a wedding," but Agent Jackson believed that his demeanor appeared deceptive, as if he was unsure of what story he was supposed to tell. Id. at 208-09, 238. Defendant said that he and Kim were not traveling with anybody else or any other vehicles. Id. at 209. Agent Wall said that the "wedding story" is so commonly used by drug couriers, it is almost a joke in highway interdiction. Id. at 156.

Defendant and Kim were taken by OBN agents to the scene of the stopped Lincoln. Id. at 220-21. A search of the Lincoln turned up a black nylon suitcase and a large green duffle bag containing over 200,000 ecstasy pills with a street value of approximately $4,000,000. Id. at 158, 174, 183-85, 272, 344. Special Agent Robert Ryan of the Drug Enforcement Administration testified that this seizure was the largest seizure of ecstasy in Oklahoma history and the seventh largest on U.S. soil, leading him to believe that the overall operation could be compared to a legitimate business like McDonald's–the people involved had different jobs and did not all need to know each other, but they all would

know that the common goal was to sell a product to an end user. <u>Id.</u> at 333, 347-49. He believed that such an organization would not release a load this size unless the organization had faith that the person managing transportation of the drugs was going to hire good workers. <u>Id.</u> at 351-52. The search of the Lincoln also revealed a hand-written list of detailed directions from California to Louisiana, <u>id.</u> at 223, a letter addressed to defendant dated January 7, 2004, <u>id.</u> at 266-67, and documents showing that the Lincoln was registered to and insured by Tuyen Quan Ngo, who is defendant's brother and who had the same address as shown on defendant's driver's license, <u>id.</u> at 154-55, 171-72, 181, 268-70, 272. In addition, agents found activated walkie-talkies in each car that were set to communicate with each other. <u>Id.</u> at 222-23, 237. Agents also found another walkie-talkie and cell phones in the Lincoln. <u>Id.</u> at 225-26. They found five cell phones in the Honda. <u>Id.</u> at 226. They found another hand-written list of directions from California to Louisiana in Kim's wallet, <u>id.</u> at 224-25, and found Kim's passport in the Lincoln, <u>id.</u> at 262. All four men were taken to jail and charged with the same two drug trafficking counts.

To sum up: the government presented evidence showing that defendant presented himself to go on a non-stop cross-country trip with three other men who all knew they were transporting drugs; he provided one of the cars and had a personal connection to one of the load vehicles–the Lincoln–even though he told OBN agents that he had no relationship with the car or its occupants; he was to be

paid for the trip; he took his turn driving and keeping in contact with the other vehicle; he was left alone for several hours in a motel room with a large duffle bag containing the bulk of approximately $4,000,000 worth of ecstasy, and he lied to OBN agents about the purpose of the trip and the number of people involved in it.

## Issues on Appeal

Defendant argues that the evidence was insufficient to show that he participated in any way in a conspiracy with the other defendants or possessed the drugs. He asserts that Hsiung's testimony shows that Hsiung, Chen, and Kim intentionally avoided defendant and left him out of the plans at Kim's insistence. Aplt. Opening Br. at 3-4. Defendant also argues that there was insufficient evidence to show that he ever exercised or had the ability to exercise dominion or control over the drugs.

## Discussion

"We review the record for sufficiency of the evidence de novo." United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). If so, we must affirm. United States v. Young, 862 F.2d 815, 818 (10th Cir. 1988).

-10-

"[W]e evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." United States v. Johnson, 130 F.3d 1420, 1428 (10th Cir. 1997) (quotations and alteration omitted). "However, we may not uphold a conviction obtained by piling inference upon inference. . . . The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998).

In light of these general propositions of relevant law, we review each of defendant's convictions in turn.

### Conspiracy

> To find a defendant guilty of conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846, the jury must find, beyond a reasonable doubt, (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators.

United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997). "It is permissible for the jury to infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." Id. (quotation omitted). "[A] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy." United States v. Small, 423 F.3d 1164, 1182 (10th Cir. 2005) (quotation omitted), cert. denied, 126 S. Ct.

-11-

1377 (2006). "A defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole." United States v. Ivy, 83 F.3d 1266, 1286 (10th Cir. 1996) (quotation omitted).

> Factors the jury, or a court reviewing a jury's verdict may consider in drawing the inference of a conspiracy include, but are not limited to: (1) a defendant's presence at the crime scene; (2) a defendant's association with co-conspirators; (3) evidence of conflicting stories; (4) active attempts to divert officers' attention from a stopped vehicle; (5) participation in drug transactions; or (6) knowledge of and control over drugs. . . . Any single factor, standing alone, may be insufficient to support an inference of conspiracy. . . . A direct correlation exists, however, between the number of circumstantial facts and the existence of a conspiracy.

United States v. Delgado-Uribe, 363 F.3d 1077, 1083 (10th Cir. 2004).

Defendant argues that the evidence was insufficient to support the conspiracy conviction because Hsiung never implicated defendant in any discussions about the plan or the planning of the trip. We disagree that such direct evidence of a conspiracy was required. The case against defendant was circumstantial. However, based on the uncontroverted circumstantial evidence, the jury could reasonably have inferred that defendant knowingly and voluntarily participated in a conspiracy to possess MDMA or ecstasy with intent to distribute. Cf. Carter, 130 F.3d at 1439-40 (explaining why uncontroverted circumstantial evidence was sufficient to support conviction for conspiracy). Defendant made the trip with three other men against whom there was direct evidence of conspiracy, and the evidence showed that two vehicles and four drivers were

required so that one car could provide a distraction from the load vehicle in case police tried to stop the load vehicle. Rather than keeping the participants in the dark as to the real purpose of the trip, Kim and Chen bragged to Hsiung about the money they were making delivering drugs and asked him if he wanted in, as they already had a third driver and needed a fourth. Defendant participated in the non-stop, cross-country trip by taking his turn driving and communicating with the load vehicle. He was to be paid a substantial amount of money for making the trip. He provided one car, the Honda, and was personally connected to the substitute load vehicle, the Lincoln. He also lied about his connection to the Lincoln and its occupants when questioned by an OBN agent. His explanation for the trip was a common excuse used by drug traffickers, and it conflicted with the explanations offered by the other men. There is no evidence that any of the other conspirators told defendant to give that excuse to police to keep him in the dark as to the real purpose of the trip. Finally, he was left alone for several hours with the bulk of the drugs.

Defendant has not made any argument showing that inference must be piled on top of inference to conclude that he knowingly and voluntarily participated in a drug trafficking conspiracy. In light of all of the circumstantial evidence and the reasonable inferences to be drawn from it, defendant's conviction for conspiracy is affirmed.

## Possession

"In order to sustain a conviction for possession with intent to distribute under 21 U.S.C. § 841(a)(1), the government must prove that the defendant: (1) possessed a controlled substance, (2) knew he possessed the controlled substance, and (3) intended to distribute the controlled substance." United States v. Mains, 33 F.3d 1222, 1228 (10th Cir. 1994). "Possession may be either actual or constructive." United States v. Triana, 477 F.3d 1189, 1194 (10th Cir. 2007). "'Actual Possession' is direct physical control, as by holding an object, or keeping it on or around one's person." United States v. Bowen, 437 F.3d 1009, 1017 (10th Cir. 2006). "'Constructive Possession' is indirect control, as by knowingly having the power to exercise dominion or control over an object although someone or something else may actually be holding it." Id. "In most cases, dominion, control, and knowledge may be inferred where a defendant has exclusive possession of the premises." United States v. Taylor, 113 F.3d 1136, 1145 (10th Cir. 1997). The jury may infer a defendant's knowledge of the controlled substances from the "collective inferences to be drawn from the evidence as a whole." United States v. Johnson, 57 F.3d 968, 971 (10th Cir. 1995) (quotation omitted). In addition, "a jury may infer intent to distribute from the possession of large quantities of drugs." United States v. Pulido-Jacobo, 377 F.3d 1124, 1131 (10th Cir. 2004).

The government argues that the evidence presented at trial was sufficient to support defendant's conviction for possession with intent to distribute MDMA under any one of three theories: (1) actual or constructive possession, (2) aiding and abetting, or (3) vicarious liability. Defendant argues that the evidence was insufficient to support the conviction because the drugs were in the other car when he was arrested.

We cannot say that no rational trier of fact could reasonably have inferred from all of the evidence that defendant knew that the load vehicle was transporting contraband, and that the large duffle bag removed from the load vehicle and left alone with him in a motel room for several hours contained that contraband. The evidence is sufficient to show that he knowingly possessed the MDMA, and the large quantity is sufficient to show his intent to distribute. His conviction for possession with intent to distribute is affirmed.

## Conclusion

The evidence was sufficient to support defendant's convictions for both conspiracy and possession.  The judgment of the district court is AFFIRMED.


Entered for the Court


Monroe G. McKay
Circuit Judge