**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JONATHAN CAVENAUGH BELL,

Defendant-Appellant.

No. 07-7040
(D.C. No. CR-06-34-RAW)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **BALDOCK**, and **LUCERO**, Circuit Judges.

Defendant-appellant Jonathan Bell appeals his conviction by a jury of one count of possession of fifty or more grams of methamphetamine with intent to distribute and one count of possession of cocaine with intent to distribute. Mr. Bell argues that his conviction was not supported by sufficient evidence in

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

that it failed to show that he possessed either the methamphetamine or the

cocaine. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

> In evaluating whether the evidence is sufficient to support the jury's verdict, we review the record de novo and ask only whether, taking the evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-in the light most favorable to the government, a reasonable jury could find [Mr. Bell] guilty beyond a reasonable doubt. . . . We evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole.

*United States v. Ramirez*, 479 F.3d 1229, 1249 (10th Cir. 2007) (quotations

omitted), *cert. denied*, 2008 WL 114113 (U.S. Jan. 14, 2008) (No. 07-7189).

> The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts. However, we may not uphold a conviction obtained by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning. The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt.

*United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998)

(citations and quotation omitted).

## II.

The record, viewed in the above manner, shows that Mr. Bell was

unemployed and was involved in the sale of marijuana, cocaine, and

methamphetamine with a friend of his named Phillip Slade, Jr., and with

Mr. Slade's girlfriend Katrina Rodgers. On April 17, 2006, Mr. Bell, Mr. Slade,

Ms. Rodgers, and Ms. Rodgers' children drove to Ms. Rodgers' mother's house in McAlester, Oklahoma, in Ms. Rodgers' black 2003 Chevrolet Impala. The three adults left the children with Ms. Rodgers' mother so they could make an overnight trip to Dallas, Texas, to purchase methamphetamine, marijuana, and cocaine.

Before leaving for Dallas, the three went to an apartment complex in McAlester, where Ms. Rodgers talked with one of the female occupants about selling her some of the methamphetamine that was going to be purchased in Dallas. Mr. Slade, who was in the front passenger seat of the car, and Mr. Bell, who was in the rear seat, did not enter the apartment. Ms. Rodgers, however, returned to the car accompanied by some of the occupants, in order to introduce them to Mr. Slade and Mr. Bell. Further discussions were held at the car with one of the other occupants about selling him some of the marijuana that was going to be purchased in Dallas. Mr. Slade, Mr. Bell, and Ms. Rodgers then left for Dallas with Ms. Rodgers driving.

Ms. Rodgers testified that when they got to Dallas, Mr. Slade directed her to a house in a residential area where the methamphetamine and cocaine were to be purchased. Ms. Rodgers testified that she knew that Mr. Slade was going to buy "a couple ounces" for "a few thousand dollars." R., Vol. 2 at 158. Mr. Slade entered the house by himself and returned fifteen to twenty minutes later. Mr. Slade then directed Ms. Rodgers to an apartment building where the

marijuana was to be purchased. Mr. Slade, Mr. Bell, and Ms. Rodgers all went into the apartment in question and met with a woman. Ms. Rodgers testified that she knew that Mr. Slade and Mr. Bell had driven together to that apartment on more than one previous occasion.[1] The woman left the apartment and, when she returned twenty or thirty minutes later with marijuana, she and Mr. Slade went into the kitchen. Mr. Slade examined the marijuana and then, with the woman's help, wrapped the marijuana in layers of cellophane and coffee grounds, put it in a shoe box, and wrapped the shoe box in Christmas wrapping paper. Mr. Slade also wrapped the cocaine and methamphetamine that was apparently purchased at the first house in layers of cellophane and coffee grounds. During this process, Mr. Bell and Ms. Rodgers remained seated in the living room. The three then left the apartment. Ms. Rodgers testified that the package was placed in the trunk of the Impala by either Mr. Bell or Mr. Slade. By that point it was about one or two o'clock in the morning of April 18th and the three drove back to McAlester, again with Ms. Rodgers driving, Mr. Slade in the passenger seat and Mr. Bell in the back.

---

[1]    Ms. Rodgers testified that she knew that Mr. Bell had previously been to the location in Dallas where the marijuana was purchased and that "it was a joke about how [Mr. Slade] actually fell asleep driving on previous occasions coming back from Dallas with him and [Mr. Bell]." R., Vol. 2 at 161. Ms. Rodgers was not asked whether she knew if Mr. Bell had previously been to the location where the cocaine and methamphetamine was purchased.

The sun was coming up by the time they reached McAlester and the three drove to the house of one of Ms. Rodgers' friends. All three went into the house where some methamphetamine was sold to one of the occupants and some cocaine to another. Who actually handled the drugs and the money during the sale is unclear. Ms. Rodgers testified: "We sold some methamphetamine to [the first occupant] . . . and then some cocaine to [another occupant]." *Id*. at 167. She testified that the sale took place in the living room of the house and that everybody that was in the house was present at the sale.

This was not the first time that Ms. Rodgers, Mr. Slade, and Mr. Bell had been to this particular house. A couple of weeks prior, the three, along with Mr. Bell's girlfriend, had purchased some methamphetamine in Oklahoma City and had then driven it to the same house in McAlester and sold some of it to the same occupant who purchased the methamphetamine on April 18. Although Ms. Rodgers testified that she drove the car with the others as passengers from Oklahoma City to McAlester, she again did not testify as to who actually handled the money or methamphetamine during that sale. She testified that she, Mr. Bell, Mr. Slade and Mr. Bell's girlfriend were all present at the sale, that she was paid money by Mr. Slade for driving on that trip, and that Mr. Bell got a portion of the methamphetamine to sell, but it is unclear whose methamphetamine was sold during the previous sale.

Following the April 18th sale, some of the house's occupants used some of the drugs they had just purchased and then Mr. Bell and Mr. Slade and two of the male occupants went outside the house and shot handguns for a while.[2] Some of the methamphetamine was traded for one of the handguns. After being at the house for about an hour and a half, Ms. Rodgers, Mr. Bell, and Mr. Slade got back into the Impala to return to Ms. Rodgers' mother's house. When they got to the car, Mr. Bell sat down in the front passenger seat and pulled a portion of the underside of the plastic dashboard cover loose and stuffed some of the methamphetamine between the cover and the dashboard to conceal it. Mr. Bell then got into the back seat and Ms. Rodgers drove the three to her mother's house.

At Ms. Rodgers' mother's house, another friend of Ms. Rodgers came by to purchase some cocaine. Ms. Rodgers, Mr. Bell, and Mr. Slade were all present at the sale, and Mr. Slade weighed the cocaine on a set of digital scales. After that sale was completed, the three prepared to go to a restaurant where Ms. Rodgers had once worked to get something to eat. Ms. Rodgers had also made arrangements to sell methamphetamine to a woman at the restaurant. The three left the house and went to a broken-down Buick also owned by Ms. Rodgers that was sitting in the driveway. Ms. Rodgers testified that they went to the car

---

[2] Only the occupants used the cocaine and methamphetamine. Ms. Rodgers testified: "None of us–[Mr. Slade], myself, and [Mr. Bell], we don't do the other stuff; we smoke marijuana." R., Vol. 2 at 169.

because "[w]e had to get the methamphetamine ready for [the customer they were meeting at the restaurant]." *Id*. at 177. Mr. Slade sat down in the front passenger seat of the Buick, with the passenger door opened, and used the digital scales to weigh out the methamphetamine that was going to be sold at the restaurant. Ms. Rodgers was standing at the passenger side door and Mr. Bell was "at the driver's side door." *Id*. at 178. The three then left for the restaurant in the Impala with Mr. Slade driving, Mr. Bell in the back seat, and Ms. Rodgers in the front passenger seat. Ms. Rodgers testified that they left for the restaurant at about 11:00 a.m., or sometime after that time, because the restaurant didn't open until 11:00 a.m.

On the way to the restaurant, the trio stopped at another house at 10th and Osage to see if another of Ms. Rodgers' friends might want to purchase some marijuana. The friend agreed and Ms. Rodgers got a small amount of marijuana from Mr. Bell, who had stayed in the car with Mr. Slade, gave it to her friend and then returned to the car and gave the money to Mr. Bell. The marijuana that was sold was not from the trip that had just been made to Dallas, since that marijuana was still boxed in the Impala's trunk.[3]

Ms. Rodgers testified that they were only at that the 10th and Osage house for about ten minutes and then the three continued on toward the restaurant with

---

[3] Ms. Rodgers testified that Mr. Bell "had the marijuana that we was smoking on for the entire trip from the time we left Oklahoma City." R., Vol. 2 at 181.

Mr. Slade driving but never made it. They drove past the father of Ms. Rodgers' children, with whom, she testified, she had a bad relationship. Ms. Rodgers was so frightened she resumed driving because she knew the area better. The three then drove back to Ms. Rodgers' mother's house. Ms. Rodgers testified that after they had returned to her mother's house, police officers showed up and she was arrested for driving with a suspended license. She also testified that once they returned to her mother's house, Mr. Slade took the handgun that had been traded for methamphetamine from the Impala and put it into the Buick.

Jane Rayburn, a retired probation and parole officer lived close to Ms. Rodgers' mother's house and testified to what she observed on April 18th. Ms. Rayburn testified that at about 12:35 to 12:40 p.m., she saw three people around the broken-down Buick in the driveway of Ms. Rodgers' mother's house. Ms. Rayburn saw Mr. Bell sitting in the driver's seat of the Buick, Mr. Slade sitting in the passenger's seat, and Ms. Rodgers standing by the passenger's seat and leaning over Mr. Slade.[4] Ms. Rayburn then saw Ms. Rodgers walk to the Impala, get a sandwich-sized bag with an inch of white substance in the bottom of it, walk to the Buick and hand the bag to Mr. Slade. Ms. Rodgers then walked

---

[4]     Ms. Rayburn testified that when she got home from work at about 12:35 or 12:40, she saw two black men and a white woman around the Buick and that she paid attention because she was hoping someone was going to buy the car and move it. Ms. Rodgers is white and Ms. Rayburn was able to distinguish the men, even from a distance, by shirt color and pattern. Mr. Bell was wearing a black shirt that day and Mr. Slade a blue-and-white-striped shirt.

back to the Impala and got in the driver's seat. Mr. Slade followed and got in the front passenger's side. Mr. Bell stayed in the Buick alone for about thirty to forty-five seconds and then walked to the right passenger's side of the Impala, got in the back seat, and the Impala left. Ms. Rayburn testified that the three individuals returned about ten or fifteen minutes later and a silver pick-up and a marked police car pulled up as well.

McAlester Police Officer Chris Morris also testified to the events of April 17th and 18th. He testified that he had received information regarding a black Chevy Impala four-door on April 17, 2006, and had seen the vehicle about 12:30 p.m. on April 18, 2006, when he was off-duty and driving his personal vehicle. Upon seeing the car, he called another officer, Bobby Coggin, for assistance and followed the Impala. He saw it pull into what turned out to be Ms. Rodgers' mother's house, saw Ms. Rodgers go into the house, and saw Mr. Slade get out of the Impala with a bag containing a white powdery substance, walk to the Buick, open it, and throw something on the floorboard. Mr. Slade returned to the Impala and Ms. Rodgers left the house and also returned to the Impala and the Impala pulled away with Mr. Slade driving. Officer Morris followed and saw the car pull into a residence at 10th and Osage at about 12:50 or 1:00. Fearing that the occupants knew they were being followed, Officer Morris left the area and changed vehicles. He returned to 10th and Osage a while later but was unable to locate the Impala. He then contacted Officer Coggin again and

they agreed to meet back at what they had determined to be Ms. Rodgers' mother's house.[5] As the officers were pulling up to the house and parking, the Impala was pulling out of the driveway of Ms. Rodgers' mother's house. The Impala had stopped and Ms. Rodgers got out from behind the wheel and asked what was going on. Mr. Slade was in the front passenger seat and Mr. Bell was in the back seat. Officer Coggin approached the car and talked to the three. Officer Coggin testified that when he talked to Mr. Bell, Mr. Bell gave him a fake name.[6] Officer Coggin also talked to Ms. Rodgers, and ran a driver's license check which showed that her license was suspended.

Officer Morris walked to the Buick and observed a plastic baggie lying on the passenger floorboard. A search warrant was obtained for the Buick and executed. The investigation revealed that the baggie on the floorboard contained 23 grams of methamphetamine. The investigation also revealed a pistol (later identified by Ms. Rodgers as the one that had been previously acquired in exchange for methamphetamine), ammunition, and a set of digital scales, all found on the floorboard of the Buick. Found in the Buick's glove compartment were baggies containing .55 grams of methamphetamine, 27.5 grams of

---

[5] The officers were evidently familiar with Ms. Rodgers and Officer Coggin had previously worked with Ms. Rodgers' mother as a correctional officer.

[6] Mr. Bell subsequently admitted to an officer who was fingerprinting him at the police station that he had used a fake name and gave that officer his real identity.

methamphetamine, and 27.4 grams of methamphetamine; a baggy containing 18.8 grams of cocaine; and two baggies containing 20.1 grams and .66 grams of marijuana. The officer that eventually seized the narcotics testified that two of the baggies that he recovered, each containing a white crystalline substance, were wrapped into bundles, with tape surrounding layers of plastic and coffee grounds, which in turn surrounded the narcotics. He testified that one of the non-bundled baggies contained a white powder.

During the inventory of the Impala, a compressed brick of 1758 grams of marijuana was found in the gift-wrapped package in the trunk and $1400 in cash was found under the armrest between the two front seats. Further investigation revealed a void behind the dashboard cover of the Impala consistent with Ms. Rodgers' testimony. Mr. Slade was also found to be carrying $380 in cash on his person.

### III.

Mr. Bell contends that the evidence presented at trial was insufficient to support conviction on the cocaine and methamphetamine counts. "To sustain a conviction for possession with intent to distribute, the government must prove that (1) the defendant possessed the controlled substance; (2) knew that he had it; and (3) possessed it with the intent to distribute it." *Ramirez*, 479 F.3d at 1249 (quotation omitted).

Mr. Bell argues that the evidence is insufficient to show that he possessed the methamphetamine and cocaine. "Possession may be either actual or constructive; constructive possession may be found if a person knowingly has ownership, dominion, or control over the narcotics and the premises where they are found." *United States v. Triana*, 477 F.3d 1189, 1194 (10th Cir.) (quotation and alteration omitted), *cert. denied*, 127 S. Ct. 2928 (2007). Mr. Bell argues that the evidence fails to show that he "had dominion and control over the cocaine and methamphetamine obtained in Dallas." Aplt. Br. at 10. He argues that "[t]agging along with drug traffickers does not furnish an adequate basis for conviction." *Id*. at 12.

We believe the evidence is sufficient to support a plausible inference that he did more than merely tag along. "When the contraband may be attributed to more than one individual, constructive possession requires some nexus, link, or other connection between the defendant and the contraband." *Triana*, 477 F.3d at 1194 (quotation omitted). "[A] conviction for constructive possession is properly sustained where the evidence supports at least a plausible inference that the defendant had knowledge of and access to the contraband." *United States v. Lauder*, 409 F.3d 1254, 1259 (10th Cir. 2005) (quotation omitted). "With regard to narcotics, we have defined constructive possession as an appreciable ability to guide the destiny of the drug. Constructive possession does not require exclusivity and may apply to multiple individuals." *Ramirez*, 479 F.3d at 1249

-12-

(quotation omitted). Said another way, "constructive possession is the ability to reduce an object to actual possession." *United States v. Massey*, 687 F.2d 1348, 1354 (10th Cir. 1982).

Mr. Bell argues that the evidence shows only that he had knowledge of the cocaine and methamphetamine and that, under *United States v. Gonzales*, 65 F.3d 814 (10th Cir. 1995), that is not enough. In *Gonzales*, the defendant tried to steal a bale of marijuana from an undercover officer during an arranged buy. The defendant asked to see the marijuana, which was in the trunk of the undercover vehicle. When the officer opened the trunk, the defendant pulled a gun and told the officer to leave, the officer tried to slam the trunk shut and then raised his hands in the air, enabling the defendant to see the gun in the officer's holster. The defendant started to take the officer's gun but then fled when a police siren went off.

The government argued that defendant had constructive possession of the marijuana because he could have taken the officer's keys and driven away or simply taken the marijuana out of the trunk. This court held that the evidence was insufficient to support constructive possession because the officer tried to slam the trunk, the defendant didn't actually take the marijuana, and the defendant fled immediately thereafter.

We agree that knowledge alone is not enough to show constructive possession. But *Gonzales* is readily distinguishable from the case at hand. This

-13-

is not a case where a defendant simply had knowledge of narcotics belonging to an acquaintance or, as in *Gonzales*, someone he intended to rob. Here, Mr. Bell, Mr. Slade, and Ms. Rodgers had an ongoing relationship. The purpose of the Dallas trip was to purchase drugs; Mr. Bell and Mr. Slade had traveled to Dallas on more than one previous trip to purchase drugs; Mr. Bell was present at pre-trip negotiations with perspective buyers, he watched Mr. Slade wrap the cocaine and methamphetamine in plastic and coffee grounds, he was present at post-trip sales of cocaine and methamphetamine, and after one of the sales he personally secreted methamphetamine under the dashboard of Ms. Rodgers' Impala. Mr. Bell was holding the marijuana that the party smoked during the entire trip to Dallas and gave some of it to Ms. Rodgers to sell to one of her friends and then took the money from the sale. Mr. Bell had also been on at least one previous trip to Oklahoma City when methamphetamine was purchased and Mr. Bell had received a portion of that methamphetamine to sell. Finally, according to Ms. Rayburn's testimony, Mr. Bell was alone in the broken-down Buick where the cocaine and methamphetamine were later found for thirty to forty-five seconds.

In *United States v. Ortiz-Ortiz*, the defendant and another man were in a car that was stopped for inspection at a port of entry in New Mexico. 57 F.3d 892, 893 (10th Cir. 1995). The defendant was a passenger in the car. The inspector noticed a strong odor of perfume or cologne in the car and further inspection

revealed marijuana hidden under and in the back seat. Both defendants testified that they had been walking toward the United States border, intending to cross the border on foot to purchase some new shock absorbers.[7] They testified that as they were walking, two people pulled up and offered to let them use their car for the trip. The car was registered to a Mexican resident with a post office address in the New Mexico town where the duo said they were headed. That person could not be contacted. The defendant claimed that the evidence was insufficient to prove his knowledge or possession of the marijuana.

This court affirmed the defendant's conviction. We noted that both the defendant and the driver had given similar stories regarding their actions that day and regarding the mysterious appearance of good Samaritans who offered them a car–specifically a car reeking of perfume and containing a large amount of contraband barely concealed under a loose seat–but made no arrangements for its return. We concluded this evidence was sufficient to support a conclusion that Ortiz was engaged in an illegal joint venture with the driver, and that constructive possession was therefore proven. *Id*. at 895 ("All who are involved in a joint venture may be found to be in constructive possession of [illegal narcotics].").

---

[7] The defendants testified a mechanic had told them that the quality of the shock absorbers was better across the border. The inventory of the car revealed used shock absorbers and the mechanic testified that he had indeed told them to buy new shock absorbers in the United States.

Here, Mr. Bell's knowledge of the cocaine and methamphetamine is undisputed. We also believe the evidence "supports at least a plausible inference that [he] had knowledge of and access to" the methamphetamine and cocaine as well. Consequently, a reasonable jury could have found beyond a reasonable doubt that, instead of merely continuously tagging along with Mr. Slade and Ms. Rodgers as they conducted their separate drug business, Mr. Bell was a partner in that business and had "an appreciable ability to guide the destiny of the drug[s]" at issue in this case.

IV.

Mr. Bell's conviction is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge