FILED
United States Court of Appeals
Tenth Circuit

November 7, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| | Nos. 05-1329 & 06-1105 |
| v. | D. Colo. |
| ROBERT JEROME JONES, | (D.C. No. 03-CR-493-WM) |
| Defendant - Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

After an altercation with two prison guards at the federal prison in

Florence, Colorado, Robert Jerome Jones was indicted on two counts of assault

resulting in bodily injury in violation of 18 U.S.C. § 111(a)1 & (b).[1]  A jury

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]  Section 111 states in relevant part:

**(a) In general.**--Whoever--

**(1)** forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in

returned a verdict of guilty on one count of assault causing bodily injury (§ 111(b)) and one count of the lesser included offense, assault which did not cause bodily injury (§ 111(a)). On July 1, 2005, Jones was sentenced on both counts to a total of thirty-six months imprisonment which were to run consecutive to the sentence he was serving at the time of the altercation. He appeals alleging error in the trial court's denial of his motion to dismiss the charges, two instructions to the jury, the sufficiency of the evidence, the district court's denial of his second motion for a new trial and, finally, the reasonableness of the sentence imposed. We AFFIRM.

## I. BACKGROUND

To a point in time, the facts are uncontested.[2] Robert Jones was an inmate

---

or on account of the performance of official duties;
. . .

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than 8 years, or both.

**(b) Enhanced penalty.**--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111 (2002).

[2] Appellant's Opening Brief and Supplemental Opening brief fail to contain appropriate references to the record. *See* Fed. R. App. P. 28(a)(7), (e). His brief was not helpful in parsing the record.

-2-

at the Bureau of Prison's Administrative Maximum (ADX) facility in Florence, Colorado. He was serving a 260-month sentence imposed after he pled guilty to second degree murder, use of a firearm in commission of a crime of violence and perjury. On July 15, 2003, Jones was scheduled to be examined by medical personnel at the prison. Officers Brian Eichers and Ronald Stevens were sent to Jones's cell to escort him to his appointment. Eichers was the unit officer in charge and Stevens was the baton-coverage officer providing protection to the officer in charge. The escort procedure required Eichers to search Jones, apply restraints (including handcuffs) and move him while maintaining contact with the chain between the handcuffs. Normally, an inmate's hands would be handcuffed behind him, but the medical staff had requested Jones's hands be restrained in front to facilitate the medical procedures. Officer Eichers, 5' 5" tall and 140 pounds, front-cuffed Jones, 5'10" tall and 180 pounds, and led Jones out of the cell.

Subsequent events are the subject of contradicting testimony. Eichers testified that before securing Jones with a belly chain around his waist as required, he could feel Jones staring into his eyes and noticed Jones appeared "angry and agitated." (R. Vol. XI at 45.) Stevens testified Jones was looking at Eichers with a "dead, cold stare" he had not seen between inmates and staff before. (R. Vol. XIII at 500.) However, when Stevens had observed such a stare between inmates, it meant "[t]hey're going to fight, in most cases." (*Id*. at 502.)

Eichers testified he asked Jones what was wrong, to which Jones gave no reply. When Eichers repeated the question, Jones stated, "You guys got the f*****g problem." (R. Vol. XI at 45.) Eichers determined Jones was too agitated to be moved and decided to terminate the escort. He told Jones to return to his cell. Jones did not respond. Eichers repeated the order two more times to which Jones replied he was not returning to his cell. Jones then stepped back and Eichers attempted to place his hand on Jones's shoulder to physically "turn him and walk him back in[to]" the cell while continuing his hold on the handcuffs' chain. (*Id*. at 54.) At this point, Jones began to wrench the handcuffs together, placing sufficient pressure to cause a "pretty good cut on [Eichers's] left thumb." (*Id*. at 56.) Jones continued to wrench the handcuffs and then pulled his hands towards his chest and above his head in an attempt to break away from Eichers. Eichers tried to move Jones against the wall to regain control. At this point, Stevens entered the fray to assist Eichers in subduing Jones. Stevens tried to use his baton to help pin Jones against the wall, but Jones grabbed it and the two struggled for the baton. During one point in the struggle, Jones was in a sitting position on the floor with Eichers on his back. Nonetheless, Jones stood up. Stevens was able to regain control of the baton and struck Jones several times "as hard as [he] could" but Jones did not react. (R. Vol. XIII at 514.) Jones again grabbed the baton and Eichers eventually brought him to the floor and got Jones in a headlock. Stevens and Jones were still struggling for the baton with Stevens

"kind of leaned back up against the wall and kind of on top of Officer Eichers." (*Id*. at 521.). Jones kicked at Stevens twice, once hitting him in the chest and narrowly missing his head.

Officer Todd Lillard, who was working in the control center, observed Jones exit the cell with an aggressive stance and an agitated facial expression. Based on this observation, Lillard turned on the intercom and heard Eichers tell Jones to step back into his cell. He saw Jones abruptly pull back from Eichers and when the melee began, he activated an alarm to call staff to assist the officers. Several officers responded and eventually secured Jones.

In contrast, Jones testified the officers provoked his reaction. He stated when Eichers and Stevens arrived at his cell, he was in an aroused state from writing a sexually explicit letter to a female. Jones maintained Eichers strip-searched him which caused Jones embarrassment. Jones stated Eichers asked him why he "was looking at him real hard for." (*Id*. at 711.) Eichers then asked Jones three times whether Jones thought it was funny that Eichers saw him in that condition. Jones testified he answered "no" and then laughed at Eichers. (*Id*.) At that point, Eichers grabbed him and the struggle ensued when Jones tried to pull away. According to Jones, when he saw Stevens coming at him with the baton, he reacted to protect himself. Jones denied trying to twist his handcuffs and stated he was not trying to take the baton from Stevens. He testified he was not trying to hurt Stevens when he kicked out but was merely trying to get

-5-

Eichers to let him go.

Jones and the officers were taken to the medical unit for examination. Paramedic Michael Carr examined Jones and applied a steri-strip band-aid to an inch long cut on Jones's left elbow and noted minor scrapes to a finger, a wrist and his middle back. Physician Assistant Anthony Osagie examined Eichers and Stevens. Eichers was treated for an injury to his left thumb and Osagie noted multiple minor scrapes on Stevens. Osagie also took Stevens's vital signs because Stevens was in a terrified emotional state.

The struggle was captured by a camera located at the end of the hall near Jones's cell. There is no audio component and the videotape is not of high quality. It is difficult to discern the participants' detailed movements and Jones has his back to the camera prior to the fight. Consequently, the tape's value is limited.

Jones was charged with two counts of assault on a federal officer resulting in bodily injury in violation of 18 U.S.C. § 111(b). Prior to trial, Jones filed a motion to dismiss the indictment alleging the government violated the Interstate Agreement on Detainers Act (IADA or the Act). He claimed the violation occurred when he was transferred back to Florence after being housed in federal facilities in Denver, Colorado. The court heard arguments at the pretrial conference and denied the motion on the first day of trial.

The jury convicted Jones of an assault on Stevens resulting in bodily injury.

The jury also found him guilty of the lesser included offense of assault with physical contact on Eichers. Jones filed two motions for a new trial. The district court denied the first motion, while the second motion remained pending. The court sentenced Jones to a total of thirty-six months, consecutive to the 260-month sentence he was serving at the time of the assaults. Jones appealed (Appeal No. 05-1329). We granted a limited remand to allow the district court to consider Jones's second motion for a new trial. After the court denied that motion, Jones filed a second appeal (Appeal No. 06-1105) from that ruling. We consolidated the appeals.

## II. DISCUSSION

Jones raises several issues. Regarding pre-trial matters, Jones argues the trial court erred in denying his motion to dismiss the indictment. He claims the government was estopped from arguing the IADA did not apply. His alleged trial errors include a challenge to two jury instructions (instructions on self-defense and the use of prior felony convictions) and insufficient evidence to support his conviction. Finally, Jones sets forth two post-trial complaints: (1) the court's sentence lacks adequate explanation and is procedurally and substantively unreasonable and (2) the trial court wrongly denied his second motion for a new trial.

A.  Pre-trial Error

The IADA is a compact "among 48 states, the United States and the District

-7-

of Columbia." *United States v. Coffman*, 905 F.2d 330, 331 (10th Cir. 1990). It provides procedures by which one correctional jurisdiction (such as Colorado state court) with charges pending against a prisoner housed in another correctional jurisdiction (for example, New Mexico state court) can arrange for transfer of the prisoner. 18 U.S.C. App. 2, § 2, Art. IV. Its purpose is to afford the prisoner a speedy trial on pending charges. 18 U.S.C. App. 2, § 2, Art. I. The IADA has a provision prohibiting the transfer of a prisoner back to the original jurisdiction prior to trial, *i.e.* the anti-shuffling provision. If such transfer occurs, the "indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." 18 U.S.C. App. 2, § 2, Art. IV(e).

After Jones was initially indicted, the United States Marshal's Service lodged a detainer with the Florence facility, a copy of which was sent to Jones. It contained instructions for securing his right to a speedy trial under the IADA. Jones complied with these instructions and government officials processed the request as if the Act applied. However, after he made his request, the government filed a petition for a writ of habeas corpus *ad prosequendum* to bring Jones to Denver, where he made his initial appearance on January 22, 2004. While the case was pending, Jones was transferred back to the Florence facility. As a result, Jones filed a motion to dismiss his case claiming his transfer back to Florence prior to trial violated the Act's anti-shuffling provisions.

Jones concedes the IADA considers the federal correctional system a single jurisdiction and, under normal circumstances, it would not apply to Jones's case. *See United States v. Walling*, 974 F.2d 140, 141 (10th Cir. 1992) (For the purposes of the IADA, the federal government "is considered a single state."). Nonetheless, because the government treated his case as if the IADA applied, it is estopped by its actions and may not argue otherwise. The district court disagreed, stating the Act "speaks for itself and is reasonably plain that its applicability does not attach in these facts, regardless of what the Bureau of Prisons or the U.S. Attorney['s] office may conclude." (R. Vol. XI at 9.) We agree.

Jones cites to *Double J. Land & Cattle Co. v. United States Dep't of Interior (Double J)*, for the proposition that the doctrine of estoppel against the government has vitality and is applicable here. 91 F.3d 1378, 1381 (10th Cir. 1996). [Appellant's Opening Br. at 15-16] However, Jones fails to address two basic requirements for estoppel against the government to apply. Because "[e]stoppel against the government is disfavored," we will not apply the estoppel doctrine against the government if doing so would "[1]'frustrate the purpose of the statutes expressing the will of Congress or [2] unduly undermine the enforcement of the public laws.'" *Id.* at 1381 (quoting *Fed. Deposit Ins. Corp. v. Hulsey,* 22 F.3d 1472, 1489 (10th Cir. 1994)). As in *Double J*, the estoppel requested in this case falls within both of these exceptions.

The IADA clearly states a Congressional intent that it not apply to transfers

between federal facilities. 18 U.S.C. App. 2, § 2, Art. II(a). Its application here would undermine the enforcement of public laws by having a defendant's criminal charges declared null and void. And, since Jones does not argue how he was prejudiced by his transfer or that it impeded the prosecution of his case, his attempt to procedurally extricate himself from a criminal indictment is particularly unavailing. The court did not err in denying Jones's motion to dismiss.

B. Trial Errors

1. Jury Instructions

"We review a district court's decision to give a particular jury instruction for an abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir.) (quotations omitted), *cert. denied,* 127 S.Ct. 2928 (2007). "We reverse only if we have a substantial doubt the jury instructions properly guided the jury in its deliberations *and* we find prejudice." *United States v. Haslip*, 160 F.3d 649, 654 (10th Cir. 1998).

a. *Self-Defense Instruction*

Jones asserts the court erred in instructing the jury on his affirmative defense of self-defense. Instruction No. 23 stated:

> Defendant asserts that the acts for which he is charged in counts 1 and 2 of the indictment were taken in self-defense against the excessive use of force by a corrections officer.

-10-

An inmate has the right to self-defense against use of excessive force by a corrections officer when that excessive force causes or threatens to cause *serious bodily injury* to the inmate. A corrections officer may use that amount of force reasonably necessary under the circumstances to compel an inmate to comply with the officer's lawful orders. Use of greater force than reasonably necessary under the circumstances is excessive and entitles the inmate to use reasonable force to defend himself against such excessive force, but the inmate may not use more force than is reasonably necessary to defend himself.

Remembering that the burden of proof beyond a reasonable doubt remains at all times on the government, you must find beyond a reasonable doubt that the government has satisfied its burden of proving that defendant did not act in self-defense against excessive force. Therefore, if you have a reasonable doubt whether or not defendant acted in self-defense, your verdict must be not guilty.

(R. Vol. I, Doc. 171, Instruction 23 (emphasis added).) Jones objected at trial to the requirement that the officer's force must threaten to cause serious bodily injury.[3] He maintains the "unlawful or excessive use of force by prison guards gives the prisoner the right to resist that force consistent with ordinary rules of self-defense." (Appellant's Br. at 9.) In other words, he claims he could respond with reasonable force if he believed it was necessary "to repel *any* excessive force used by federal law enforcement officers." *United States v. Span*, 970 F.2d 573, 578 (9th Cir. 1992) (*Span I*) (emphasis added).

---

[3] On appeal, he also argues the instruction erroneously precludes acquittal should the jury believe Jones reasonably believed excessive force was being used. Finally, Jones contends the explanation of excessive force renders the instruction internally inconsistent. Neither of these objections were presented to the trial court and Jones does not argue the trial court's instruction was plain error. Further, Jones approved another instruction containing these same flaws. Thus, pursuant to Fed. R. Crim. P. 30(d), these arguments will not be considered.

We have not had occasion to address the application of self-defense to a charge under 18 U.S.C. § 111 involving a fight between guards and a prisoner, let alone the parameters of such a defense. As an initial observation, we note the statute does not supply an affirmative defense. As the Supreme Court has stated, "it is an open question whether federal courts ever have authority to recognize a [common law] defense not provided by statute." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491 (2001) (addressing whether a necessity defense inferred in Controlled Substances Act). "Whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference." *Id*. (quoting *United States v. Rutherford,* 442 U.S. 544, 559 (1979)). Nonetheless, both the Supreme Court and this Court have discussed the possibility of self-defense as justification for a charge under § 111, presumably because "Congress legislates against a background of Anglo-Saxon common law." *Id*. at n.3 (quoting *United States v. Bailey*, 444 U.S. 394, 415 n.11 (1980)).

For instance, in *United States v. Feola*, the Supreme Court concluded § 111 did not require knowledge that the victim of the assault was a federal officer as an element of the crime. 420 U.S. 671, 684 (1975). Even so, the Court stated that the defendant's knowledge of the identity of the victim may play a part "where an officer fails to identify himself or his purpose [and] his conduct . . . might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property." *Id*. at 686. "In a situation of that kind, one might be

-12-

justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent." *Id.*

We have referred to self-defense as an affirmative defense to a § 111 charge in two cases. In *United States v. Williams*, we determined sufficient evidence was presented to uphold the defendant's conviction for a violation of § 111, despite his claim of self-defense. 440 F.2d 1300, 1302 (10th Cir. 1971). In *United States v. Montoya*, we observed "[a] defendant who assaults a federal law officer, unaware of the latter's status and reasonably believing himself to be acting in a protective posture, may be entitled to a self defense instruction." 676 F.2d 428, 431 (10th Cir. 1982). However neither *Montoya* nor *Williams* were asked to consider whether the statute "might be unable to bear any necessity defense at all." *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 491 n.3. And the argument is not raised here. Therefore, we merely assume without deciding that such a defense exists. *See United States v. Patton*, 451 F.3d 615, 637 (10th Cir. 2006) (assuming a necessity defense applies to a felon in possession of body armor).

Assuming the defense exists, we must decide the parameters of that defense, in particular whether ordinary rules of self-defense apply to a charge of assault on a federal officer within the prison environment. This is a matter of first impression. We begin by examining the Congressional purpose in passing 18 U.S.C. § 111 and the contours of the common law. We then apply that discussion

to the specific circumstances of this offense – the location of the assault (prison) and the identity of the participants (inmate and guards). In the end, we conclude Jones, a prisoner, does not have the right to respond with force to any force he believes is excessive.

In passing 18 U.S.C. § 111, Congress intended to accomplish dual purposes; "to protect both federal officers and federal functions." *Feola*, 420 at 679. "[I]ndeed, furtherance of the one policy advances the other." *Id*. "Congress clearly was concerned with the safety of federal officers insofar as it was tied to the efficacy of law enforcement activities." *Id*. at 681.

Generally, under the common law, a claim of self-defense as justification for the commission of a crime was described as follows:

> Another species of compulsion or necessity is what our law calls duress *per minas* (by threats); or threats or menaces, which induce a fear of death or other bodily harm, and which take away for that reason the guilt of many crimes and misdemeanors; at least before the human tribunal. But then that fear, which compels a man to do an unwarrantable action, ought to be just and well-grounded; such . . . as might seize a courageous man not timid or fearful . . . .

WILLIAM BLACKSTONE, 2 COMMENTARIES *30 (quotations omitted). In other words, "one who is unlawfully attacked by another, and who has no opportunity to resort to the law for his defense, should be able to take reasonable steps to defend himself from physical harm." 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIM. LAW, § 10.4(a) at 143 (2d ed. 2003). However, self-defense is only available when "the adversary's force be, or at least that the defendant reasonably believes

it to be, 'unlawful' force – meaning, in general, that it be a crime or tort (generally assault and battery) for the adversary to use the force." *Id*. at 144. The common law does not specifically address a prisoner's claim of self-defense against prison guards.

Jones recognizes his defense is available only in response to "excessive force" by the prison officials, but insists the defense is viable when there is a reasonable fear of any bodily injury, not serious bodily injury. Thus, we look to the contours of "excessive force" for the proper elements for Jones's affirmative defense. Jones would have us adopt his reading of the Ninth Circuit's position under *(Span I)*, 970 F.2d 573, and *United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) (*Span II*). He claims these cases stand for the proposition that the ordinary rules of self-defense apply to resistance to the unlawful or excessive use of force by prison guards. He is incorrect on several levels.

First, in *Span I* and *Span II* two federal agents were involved in a physical conflict with Jerry and Darlene Span while investigating the location of a fugitive. Thus, the case did not concern excessive force in a prison setting (Eighth Amendment – cruel and unusual punishment) but excessive force outside the prison setting (Fourth Amendment  – reasonable search and seizure),[4] *Span I*, 970 F.2d at 577 n.3. (citing *Graham v. Connor*, 490 U.S. 386, 394-96 (1989)).

---

[4] We express no opinion here on the appropriate self-defense instructions in a non-prison setting.

Second, the Ninth Circuit specifically recognized a distinction between a general self-defense instruction and an instruction on self-defense in the context of excessive force. *Id.* at 578 n.5 ("The elements of a general right of self-defense do overlap with those of a more narrowly-defined right of self-defense against excessive force, but they also differ in important ways."). Indeed, the court based its conclusion that the Spans' claims failed because, *inter alia*, "the general self-defense instruction offered by the Spans does not amount to a proposed instruction on the right to offer reasonable resistance to repel any excessive force used by federal law enforcement officers." *Id.* at 578. *Span II* merely determined trial counsel was ineffective because he had failed to offer the proper instruction, again noting the distinction between a general self-defense claim and an excessive force claim. *Span II*, 75 F.3d 1388-90. As a result, neither *Span I* nor *Span II* is applicable to the circumstances of this case.[5]

In a prison setting, the use of excessive force against a prisoner is analyzed

---

[5] Jones's reliance on *United States v. Loman*, fails for the same reasons. 551 F.2d 164 (7th Cir. 1977). There, a postal worker was involved in an altercation with residents on her route. The court determined an instruction informing "the jury that Hilda Loman had a right to defend herself against any unlawful attack but that if she acted in self-defense, excessive force was not permissible" adequately apprised the jury of the law of self-defense. *Id.* at 168. What Jones fails to recognize is that a proper instruction on self-defense does not arise solely from the general charge, a violation of § 111, but from the specific circumstances in which the offense occurred.

under the Eighth Amendment prohibiting "cruel and unusual" punishment.[6] *See*

*Whitley v. Albers*, 475 U.S. 312, 319-20 (1986).  "The infliction of pain in the

course of a prison security measure . . . does not amount to cruel and unusual

punishment simply because it may appear in retrospect that the degree of force

authorized or applied for security purposes was unreasonable, and hence

unnecessary in the strict sense." *Id*. at 319.  Rather, "[i]t is obduracy and

wantonness, not inadvertence or error in good faith, that characterize the conduct

prohibited by the Cruel and Unusual Punishments Clause, whether that conduct

occurs in connection with establishing conditions of confinement, supplying

medical needs, or restoring official control over a tumultuous cellblock." *Id*.

The distinct excessive force analysis in a prison environment is based on a

consideration of both a prisoner's legal status and the unique interests of a penal

institution.  While "convicted prisoners do not forfeit all constitutional

protections by reason of their conviction and confinement in prison," this "does

not mean that these rights are not subject to restrictions and limitations." *Bell v.*

*Wolfish*, 441 U.S. 520, 545 (1979).

> Lawful incarceration brings about the necessary withdrawal or
> limitation of many privileges and rights, a retraction justified by the
> considerations underlying our penal system.  The fact of confinement

---

[6] The Eighth Amendment states:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  It applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977).

as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. There must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

*Id*. at 545-46 (quotations and citations omitted). "Maintaining institutional security and preserving internal order and discipline are essential goals" and "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel . . . ." *Id*. at 546-47.

Countless opinions have recognized the dangers inherent in the prison environment.

Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others.

*Hudson v. Palmer*, 468 U.S. 517, 526 (1984). "[S]taff on the front line . . . daily encounter prisoners hostile to the authoritarian structure of the prison environment." *Sandin v. Conner*, 515 U.S. 472, 482 (1995). "The very reason a corrections officer position exists is to provide safety and security to the public, as well as to prison employees and inmates; as such, the ability to provide safety and security, including the ability to respond without hesitation or limitation in an emergency is absolutely inherent to that position." *Frazier v. Simmons*, 254 F.3d 1247, 1258 (10th Cir. 2001) (describing essential duties of a prison guard)

-18-

(quotations and citation omitted).

While, under *Whitley*, the extent of injury suffered by an inmate is but one of several factors suggesting the use of force is excessive (wanton and unnecessary), we must also consider one of the purposes of § 111 is to further a federal official's effective function. 475 U.S. at 321. To determine whether excessive force exists, "it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (quotations omitted). It is unrealistic to expect prison officials and inmates to objectively ponder these various factors in the short moments preceding physical contact.

Rather, we look to analogous situations in which we have allowed a prisoner an affirmative defense. For example, in *United States v. Bailey*, inmates escaped from prison allegedly because of a pattern of excessive force and inhumane treatment by prison guards. 444 U.S. at 398. The Supreme Court assumed the inmates could claim the affirmative defense of necessity or duress:

> Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical

-19-

forces beyond the actor's control rendered illegal conduct the lesser of two evils.

*Id*. at 409-10. Under the common law, self-defense as an affirmative defense to a crime was one form of duress. WILLIAM BLACKSTONE, 2 COMMENTARIES *30. The defense of duress has been considered in several situations where the inmate sought justification for a crime committed while in prison. *See United States v. Sahakian*, 453 F.3d 905, 909 (7th Cir. 2006) (rejecting requested necessity instruction in defense of carrying a knife in prison because a defendant "must establish that he was under imminent fear of death or serious bodily harm"); *see also United States v. Bello*, 194 F.3d 18, 27 (1st Cir. 1999) (addressing duress defense to a charge of assault on a fellow inmate, and stating, "[a]s we have already discussed in rejecting the self-defense claim, there was no immediate threat of serious bodily injury or death here").

In *United States v. Butler*, we recently analyzed a justification defense relating to a charge of felon in possession of a firearm. 485 F.3d 569 (10th Cir. 2007). We noted:

> Courts have used the terms duress, necessity, and justification interchangeably. This may be due to the development of the defense by drawing upon common law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. In modern times, the traditionally separate defenses of necessity and duress have become increasingly blurred . . . to the point of merger.

*Id*. at 572 n.1 (quotations and citation omitted).

-20-

In *United States v. Leahy*, another felon-in-possession case, the First Circuit discussed the relationship of self-defense to necessity and duress. 473 F.3d 401 (1st Cir. 2007). It reasoned "that although some courts have performed separate self-defense and necessity analyses," there is no case taking a "position on whether those defenses could be viewed as interchangeable." *Id.* at 406. The court concluded, "that ease in administration favors treating these three defenses, [necessity, duress and self-defense] in a federal felon-in-possession case, under a single, unitary rubric: justification." *Id.*

The First Circuit's reasoning is sound and we see no reason why it should not extend to a charge of assault by a prisoner against a guard. In this Circuit, a justification defense requires:

> (1) that defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
>
> (2) that defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
>
> (3) that defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and
>
> (4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.

*Butler*, 485 F.3d at 572 (quoting *United States v. Vigil,* 743 F.2d 751, 755 (10th Cir. 1984)); *see also United States v. Portillo-Vega*, 478 F.3d 1194, 1197 (10th

Cir. 2007) ("A duress defense 'requires the establishment of three elements:  (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm.'") (quoting *United States v. Merchant,* 992 F.2d 1091, 1096 (10th Cir. 1993)).

To require less than the threat of substantial bodily injury in a prison environment, where physical contact between officers and inmates, (sometimes rough) is common and necessary, would poorly serve the Congressional concerns and the dual purpose of § 111.  To require only a threat of "bodily harm" would allow a prisoner to physically resist prison guards any time he "reasonably" believed the guard was exceeding the force necessary to maintain prison or personal security.  For example, such a rule would allow any prisoner to physically resist if the prisoner reasonably believed his handcuffs were too tight causing momentary interruption of his circulation.  Guards would second-guess every use of force to ascertain whether the force used exceeded, even by a bit, what was necessary.  Such a rule would threaten the efficient and safe function of the prison system.  "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force.  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sampley v. Ruettgers*, 704 F.2d 491,

-22-

494 (10th Cir. 1983). "A court should also bear in mind that a prison guard, to maintain control of inmates, must often make instantaneous, on-the-spot decisions concerning the need to apply force without having to second-guess himself." *Id*. at 496. Thus, applying the "ordinary" rules of self-defense in the prison setting could well defeat the dual purpose of 18 U.S.C. § 111; we can foresee the possibility of a more dangerous environment as a result. *Id*. at 495 ("Hamstringing prison guards, however, by forbidding their use of the force necessary to maintain control of the prison not only would endanger the guards but also could subject the prisoners themselves to greater violence at the hands of their fellow inmates.").

Contrary to Jones's position, our case law has impliedly approved instructions requiring serious bodily harm when considering a prisoner's right to use force against others in prison. For example, in *United States v. Scalf*, an inmate on inmate assault case, we rejected an argument the district court erred in giving a self-defense instruction requiring the presence of serious bodily harm rather than Scalf's proposed instruction requiring only "the imminent use of unlawful force." 725 F.2d 1272, 1273, 1276 (10th Cir. 1984) (quotations omitted). We held "[t]he court's instruction on self-defense was proper and most adequate particularly when, as here, Scalf was the aggressor; Scalf admitted chasing after [the other inmate] and stabbing him five or six times; Scalf acknowledged [the other inmate] made no moves toward him at the time he

-23-

stabbed [him]; and Scalf acknowledged that [the other inmate] had never touched him." *Id*. at 1276. Jones argues *Scalf* does not apply here because he was not the first aggressor and did not retaliate with force that would result in serious bodily harm.

However, *Scalf* is not our only case considering self-defense behind prison walls. Facts very similar to those in this case are found in *Williams*. There, a prison guard attempted to transport the defendant to a different cell because of his threatening behavior. The defendant resisted being placed in the cell and hit the guard above his eye. At trial, the defendant and three other inmates all "blamed the onset of the trouble on the officers and testified that [the defendant] had been beaten by them." *Williams*, 440 F.2d at 1302. The trial court instructed "that when a prisoner is unlawfully attacked so as to induce in him a belief that he is in *serious bodily harm or of losing his life* that the prisoner may resort to the defense of his person and use whatever force that seems necessary at that time to repel the unlawful attack in order to save himself from serious bodily injury." *Id*. (quotation omitted) (emphasis added). While the issue on appeal was the sufficiency of the evidence, we found no error in the jury's guilty verdict in light of the trial court's "strong charge." *Id*.

In sum, assuming there is a self-defense justification to a charge under § 111, limiting the defense in cases involving inmate assaults on guards to only those situations where the inmate reasonably fears imminent serious bodily harm

or death is a pragmatic approach to balancing the purposes of § 111 with the rights of the inmates.  We conclude the court did not err in its instruction to the jury.

### b. *Instruction on Prior Conviction*

Jones called two fellow inmates to testify at trial.  He also took the stand. During his direct examination he admitted to his three prior felony convictions from 1989, one of which was for perjury.  At trial, the court's instructions included Instruction 10 which stated:

> You have heard evidence that witnesses were convicted of felonies, including perjury in the case of the defendant.  You may consider this evidence, along with other pertinent evidence, only in deciding whether or not to believe this witness and how much weight to give the testimony of that witness.

(R. Vol. I, Doc. 171, Instruction 10.)  Jones objected, complaining the jury instruction impermissibly singled out his perjury conviction. **[Vol. XIV at 806]** On appeal, he argues there is no authority allowing the court to single out a defendant's convictions and maintains he was entitled to a neutral instruction. Jones further claims the instructional error is not harmless.  While he admitted to the perjury conviction at trial, he argues prejudice due to the government's cross-examination of Jones's fellow inmates.  On direct examination, the inmates testified they heard Jones saying "what are you doing" and "let me go, let me go" during the struggle.  (*Id*. at 669-60, 683.)  During cross-examination, the government asked the inmates if they knew about Jones's perjury conviction.  The

-25-

government also used the perjury conviction in closing argument to attack Jones's credibility. Jones does not claim the cross-examination or the closing argument was error. Rather, he contends the instruction unfairly underscored this evidence. Noticeably absent from Jones's argument is any citation to relevant case authority to sustain his claim of error.

Rule 609(a)(2) of the Federal Rules of Evidence makes evidence of prior criminal convictions involving "an act of dishonesty or false statement" the most readily admissible of all prior convictions, presumably because such evidence is highly relevant for the jury in assessing credibility. As Jones concedes, the admission of his prior perjury conviction was fair game. He does not contend the trial court misled the jury as a matter of law but claims that merely pointing out the conviction was prejudicial error. We need not determine whether the district court erred because, in any event, Jones fails to establish prejudice. "A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *United States v. Jordan*, 485 F.3d 1214, 1222 (10th Cir. 2007) (quotations and citation omitted). In *United States v. Grier*, the Seventh Circuit concluded the trial court's specific reference to prior conviction in instruction did not prejudice the defendant as the jury had already learned of the conviction through both his direct and cross-examinations. 823 F.2d 177, 178 (7th Cir. 1982). Here, the perjury conviction was properly before the jury, the government's use of the conviction

-26-

was not unfair and the instruction's substance properly stated the law. Accordingly, to the extent the reference to Jones's perjury conviction was error, it was harmless.

*c. Sufficiency of the Evidence*

We review the sufficiency of the evidence de novo, asking "only whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Triana*, 477 F.3d at 1194 (quotations omitted). Jones insists the video of the events conclusively demonstrates he was justified to resist the excessive and unlawful force used by the guards. We disagree. What can be seen in the video supports the officers' testimony as much, if not more, than Jones's version of events. After careful review of the videotape, recognizing its marginal quality, and a full review of the entire record, we conclude there is sufficient evidence supporting the jury's verdict.

C. Post-Trial Errors

1. Jones's Sentence

Prior to Jones's sentencing hearing, the probation department prepared a pre-sentence report (PSR) using the 2002 version of the sentencing guidelines. For Count I, the assault on Eichers resulting in physical contact, the PSR recommended applying the offense guideline for aggravated assault. *See* USSG

§2A2.2. "'Aggravated assault' means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; or (C) an intent to commit another felony." *Id*., comment. (n.1). The PSR suggested Jones's attempt to get Stevens's baton during the struggle was an attempt to use a dangerous weapon to cause bodily injury. Under the aggravated assault provision, the base offense level was 15. *See* USSG §2A2.2(a). Three levels were added for brandishing or threatening to use a dangerous weapon. *See* USSG §2A2.2(b)(2)(c). Another three-point increase was included because Eichers was a prison official and Jones was in his custody at the time of the assault. *See* USSG §3A1.2(b). The PSR also recommended a two-level upward adjustment for obstruction of justice, explaining Jones's testimony at trial appeared to falsify material facts. *See* USSG §3C1.1. Thus, for Count I the adjusted base offense level was 23.

For Count II, the assault on Stevens resulting in bodily injury, the PSR recommended the same base offense level, adjustments and enhancements recommended for Count I, but also included a two-level increase because Stevens sustained bodily injury. See USSG §2A2.2(b)(3)(A). After applying a two-level multiple-count adjustment, the combined total offense level was 27. *See* USSG §3D1.4.

The PSR calculated Jones's Criminal History as Category III. The government requested it be increased to Category IV based on Jones's

disciplinary history while in custody. The PSR rejected the government's suggestion but stated, "the court may want to consider the defendant's inmate disciplinary record and his prior offenses that were not assessed criminal history points . . . when selecting a point within the guideline range or as aggravating factors under 18 U.S.C. § 3553(a)." (R. Vol. XVIII at 17.) Based on an offense level of 27 and a Criminal History Category of III, the guideline range for imprisonment was 87 to 108 months.

The PSR also offered alternate guideline computations in the event the court did not agree the aggravated assault guideline applied. Applying USSG §2A2.4 (Obstructing or Impeding Officers), the base offense level was 6. Adding three levels because the conduct involved physical contact and two levels for obstruction of justice, the total combined offense level was 13. Based on a total offense level of 13 and a Criminal History Category of III, the alternate guideline range for imprisonment was 18 to 24 months.

Addressing the sentencing factors in 18 U.S.C. § 3553(a), the PSR suggested "the court may consider that the defendant was involved in an assault on two correctional officers, which by its nature is a serious offense," his history of violence before and during his imprisonment, and his poor adjustment to the prison environment making it highly likely there will be further disciplinary problems while he is incarcerated. (R. Vol. XVIII at 24.) The PSR also stressed "the need for the court to afford adequate deterrence to criminal conduct." (*Id.* at

R-2).

Jones objected to the PSR's statement of the offense conduct, its use of the aggravated assault guideline, the obstruction of justice adjustment and his prison disciplinary record as a sentencing factor. He argued the total offense level should be 11 resulting in a guideline range of 8 to 14 months imprisonment.

The court held two sentencing hearings. The first took place on May 2, 2005, and was primarily the presentation of the government's evidence to support its guideline range arguments. The government introduced the videotape of the struggle as evidence of an aggravated assault. To support its request for an increased Criminal History Category, the government introduced, over Jones's objection, his prison disciplinary records. Although the court allowed the exhibits, it stated it would give the disciplinary records little, if any, weight in determining the guideline range because the administrative findings were not based on a full factual hearing. The government then introduced a transcript of Jones's trial testimony to support an obstruction of justice adjustment, claiming Jones's testimony was generally a series of material falsehoods.

The government also called a former inmate at Florence who was an orderly (cleaning person) at the location where Jones was housed for several months after the assault on Eichers and Stevens. The former inmate testified Jones approached him the day after the altercation, asking him to sign an affidavit falsely stating he had witnessed Jones having problems with the same guards in

the past.  He also said Jones had given him a letter to pass on to another inmate requesting that inmate's sister to perform a background check on Stevens and Eichers, as well as others who helped subdue Jones.  In addition, Jones allegedly stated in the letter "he wasn't beyond killing these people that had harmed him." (R. Vol. XVI at 34.)

The second hearing took place on July 1, 2005.  After hearing counsels' final arguments on the guideline calculations, the court ruled the government failed to show by a preponderance of the evidence that Jones intended to use the baton as a deadly weapon and therefore, the court would apply USSG §2A2.4, not the aggravated assault guideline.  The court also concluded the government failed to identify specific instances of material falsehoods in Jones's testimony and consequently, it would not apply an obstruction of justice adjustment.[7]  Based on the court's rulings, it effectively determined the appropriate guideline range was 12 to 18 months imprisonment.

The court then allowed counsel to present argument under the 18 U.S.C. § 3553(a) factors.  Jones argued a lenient sentence was warranted due to Jones's mental condition as a result of his lengthy incarceration, his lack of family support including the recent death of his mother, and ended by urging the court to "treat this as a . . . rather modest assault as criminal assaults go."  (R. Vol. XVII

---

[7]  The court did not address the inmate's testimony in its oral rulings but found no credibility in his rendition of events in its written order.

-31-

at 33.)  Following the government's response seeking a sentence above the

guidelines based on the § 3553(a) factors, the court stated:

> [The guideline recommendation] is one factor of several to be
> considered pursuant to Section 3553(a).  And I do consider the
> guidelines since they are a product of a lot of experience and study
> and it does provide us with some handholds in determining a rational
> range of sentence applicable to individuals.
>
> The factors under the statute in addition to the guidelines, of course,
> . . . the history and characteristics of the defendant, that's well
> stated.  And he does have a violent history and a history that
> conflicts with an ordered society.  And the nature and the
> circumstances of the offense . . . have been belabored by both sides
> through trial and now through sentencing.  I do conclude . . . that it
> could be that the defendant's view of what happened is more accurate
> than that of the officers.  We just simply – the evidence doesn't make
> it obvious.
>
> But what is obvious is that the jury decided and that is the law as far
> as we are concerned that this defendant forcibly assaulted the officers
> in a voluntary and intentional manner.  That's the jury determination.
> And particularly in ADX, but in prisons generally, that determination
> requires punishment.  The punishment as we know is to reflect the
> seriousness of the offense, promote respect for law, should include
> adequate deterrence, protect the public from further crimes of the
> defendant, provide him with education, training and so forth, and
> avoid particular unwarranted sentencing disparities.
>
> When I look at this, I certainly feel that the defendant must be
> punished for deterrence, for protection and hopefully to promote
> respect for the law.  I agree with the Government that it is a very
> serious circumstance, what happened, and given the jury's
> determination, I believe that a reasonable and just punishment would
> necessarily be something more than the guideline calculations as
> stated . . . .
>
> The circumstances of this individual, and keep in mind that the
> struggle is certainly serious, but the injury and so forth
> comparatively minor, I think an appropriate sentence . . . and by
> appropriate I mean reasonable and just – would be three years
> consecutive [to the time currently being served] and I will impose

that sentence.

(*Id.* at 41-43.)

a)  *Standard of Review*

After *United States v. Booker,* 543 U.S. 220 (2005), we review a sentence
for reasonableness, "encompass[ing] both the reasonableness of the length of the
sentence, as well as the method by which the sentence was calculated."  *United
States v. Kristl,* 437 F.3d 1050, 1055 (10th Cir. 2006) (emphasis omitted).  In
*United States v. Lopez-Flores*, we determined an objection to the adequacy of the
court's explanation for its sentence is an objection to the method by which the
sentence was calculated.  444 F.3d 1218 (10th Cir.), *cert. denied,* 127 S.Ct. 3043
(2006).  An adequate explanation is required by 18 U.S.C. § 3553(c) which states,
in relevant part:

> The court, at the time of sentencing, shall state in open
> court the reasons for its imposition of the particular
> sentence, and, if the sentence . . . is outside the
> [guideline] range, . . . the specific reason for the
> imposition of a sentence different from that described,
> which reasons must also be stated with specificity in the
> written order of judgment and commitment . . . .

We concluded if the defendant does not object to the district court's lack of
explanation after it announced his sentence, "plain-error review is appropriate."
*Lopez-Flores*, 444 F.3d at 1221.

Relying on *Lopez-Flores*, the government claims Jones is attacking only the
adequacy of the explanation given by the trial court for his sentence, *i.e.*, the

-33-

method used to calculate the sentence. Because Jones did not object below, the government asserts our standard of review is for plain error. In his reply brief, Jones claims his appeal attacks both the method by which the sentence was reached and its length. He argues the government's reliance on *Lopez-Flores* is misplaced because its holding is limited to objections relating to guideline sentences.

We recently clarified the confusion regarding the standard of review in the absence of an objection to the trial court's failure to fully articulate its reasons for imposing a specific sentence. *United States v. Romero*, 491 F.3d 1173 (10th Cir.), *cert. denied,* __ S.Ct.__, 2007 WL 2300385 (2007). In *Romero*, we reviewed a sentence imposed for illegal reentry into the United States. We recognized *Lopez-Flores* had created some confusion because, in that case, the defendant failed to raise any substantive argument that the § 3553(a) factors merited a below-guidelines sentence. *Id.* at 1176. This fact "raise[d] some question as to whether this omission affected our determination that his procedural objection went unpreserved." *Id.* We clarified our approach in *Romero*, and applied a plain error standard despite Romero's argument requesting the court to lower his sentence from the guideline range. *Id.* at 1176-78. We took the opportunity to reassert "[o]ur conviction that the requirement of contemporaneous objection to procedural errors is consistent with our precedent and represents a reasonable burden on defendants . . . ." *Id*. at 1177. *Romero*

-34-

contains no indication the plain error standard of review is inapplicable when a general argument as to the length of the sentence is presented nor did we limit the holding only to within-guidelines sentences. *Id.* at 1176-78. We reiterated the purpose of an objection is to alert the court to error that can be immediately corrected. *Id.* at 1177. It is even more incumbent on a defendant to object when the court imposes an above-guidelines sentence which the defendant believes is not adequately explained. Consequently, we apply a plain error standard to Jones's claim the district court did not articulate the factors supporting a sentence exceeding the guideline range. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Lopez-Flores,* 444 F.3d at 1222 (quotation omitted).

On the other hand, "it is unnecessary to argue to the district court after imposition of the sentence that the sentence is unreasonably long." *Id.* at 1221. Thus, we review the ultimate sentence imposed for reasonableness. *United States v. Mares,* 441 F.3d 1152, 1159 (10th Cir. 2006), *cert. denied*, 127 S.Ct. 3048 (2007).

b) *Adequate Exposition*

"[W]hen a district court imposes a sentence outside the Guidelines, the level of scrutiny we apply in reviewing the sentence depends on the 'comparative difference' between the applicable range under the advisory Guidelines and the

actual sentence imposed." *United States v. Hildreth,* 485 F.3d 1120, 1127 (10th

Cir. 2007) (quoting *United States v. Cage*, 451 F.3d 585, 594 (10th Cir. 2006)).

We look to the percentage of divergence as well as the "absolute number of

months above or below the Guidelines range." *United States v. Valtierra-Rojas,*

468 F.3d 1235, 1240 (10th Cir. 2006), *cert. denied*, 127 S.Ct. 2935 (2007). The

detail with which the court must explain its decision to vary from the guideline

range is relative to the degree of the discrepancy between the sentence and the

advisory range. *Cage*, 451 F.3d at 594 ("Had the comparative difference been

smaller but still outside the guidelines range, the district court's decision would

not have been presumptively reasonable but an appropriate justification would

suffice for this court to determine that it is reasonable.").[8]

Here, Jones received a sentence of twice the 2002 guidelines maximum or

in other words, an additional eighteen months. This is certainly not extreme when

viewed in light of our cases. *See United States v. Mateo*, 1170 (10th Cir. 2006),

(471% or eight years upward variance is an "extreme" divergence), *cert. denied*,

127 S.Ct. 2890 (2007); *Valtierra-Rojas,* 468 F.3d 1235, 1237 (122% or thirty-

three month variance is "substantial," rather than extreme); *United States v.*

*Bishop*, 469 F.3d 896, 908 (10th Cir. 2006) (37% or twenty-one month variance a

---

[8] The Supreme Court has recognized "a number of circuits adhere to the proposition that the strength of the justification needed to sustain an outside-Guidelines sentence varies in proportion to the degree of the variance." *Rita v. United States*, 127 S.Ct. 2456, 2467 (2007). The Court will consider this approach this term in *United States v. Gall,* No. 06-7949. *Id.*

"significant" increase).  Rather, the variance in Jones's sentence is substantial but not extreme.  We therefore require the court to express sufficiently compelling reasons but "they need not be as 'dramatic'" as the reasons supporting an extreme divergence.  *Valtierra-Rojas*, 468 F.3d at 1240.

The district court's explanation was sufficient.  The PSR, incorporated in part in the sentencing record, stated, "the need for the court to afford adequate deterrence to criminal conduct is great in this case.  The 36-year-old defendant has been incarcerated for the last 15 years . . . .  The defendant has a history of poor institutional adjustment in the BOP, and his behavior problems in prison have escalated during his period of imprisonment."[9]  (R. Vol. XVIII at R-2.)  At sentencing, the court reiterated its concerns regarding Jones's violent history and the seriousness of the offense.  It noted the special considerations given to the location of the offense and the identity of the victims.  Thus, an exceptional need for deterrence, protection and the promotion of respect for the law was sufficiently explained.

In addition, Jones does not allege any error by the district court that affected his substantial rights or that the court's failure to give a satisfactory explanation would change "'the outcome of the district court proceedings.'"

---

[9] Jones's disciplinary history included numerous incidents of insolence or refusing to obey orders, one incident of threatening a staff member, one incident of indecent exposure to a corrections officer, four incidents of fighting or assaulting other inmates, and five incidents of possessing a weapon or sharpened tool.

*United States v. Trujillo-Terrazas,* 405 F.3d 814, 819 (10th Cir. 2005) (quoting

*United States v. Olano,* 507 U.S. 725, 734 (1993)). "[W]e will not supply such an

argument for him." *Romero,* 491 F.3d at 1179. For these reasons, Jones has

failed to demonstrate the trial court's explanation for imposing an above-

guidelines sentence was error, let alone plain error.

c) *Reasonableness of Sentence*

Reasonableness is guided by the statutory factors delineated in 18 U.S.C.

§ 3553(a). *Hildreth*, 485 F.3d at 1127.

> [Section] 3553(a) . . . tells the *sentencing judge* to consider (1)
> offense and offender characteristics; (2) the need for a sentence to
> reflect the basic aims of sentencing, namely (a) 'just punishment'
> (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3)
> the sentences legally available; (4) the Sentencing Guidelines; (5)
> Sentencing Commission policy statements; (6) the need to avoid
> unwarranted disparities; and (7) the need for restitution. The
> provision also tells the sentencing judge to 'impose a sentence
> sufficient, but not greater than necessary, to comply with' the basic
> aims of sentencing as set out above.

*Rita*, 127 S.Ct. at 2463 (quoting 18 U.S.C. § 3553(a)).

Jones complains the court's sentence of twice the upper limit of the

advisory guideline range is presumptively unreasonable. This argument is

foreclosed by our recent holding in *Valtierra-Rojas*, 468 F.3d at 1239. ("We join

these circuits in holding that a sentence outside of the properly calculated

Guidelines range is not *presumptively* unreasonable."); *see also Rita*, 127 S.Ct. at

2467 ("The fact that we permit courts of appeals to adopt a presumption of

reasonableness does not mean that courts may adopt a presumption of unreasonableness."). Consequently, Jones is afforded no presumption his above-guidelines sentence is unreasonable.

"A substantively reasonable sentence ultimately reflects the gravity of the crime and the § 3553(a) factors as applied to the case." *Hildreth*, 485 F.3d at 1127 (quotations omitted); *see also Cage,* 451 F.3d at 594. "[T]here is no formula into which we input the degree of divergence in order to generate precisely how compelling the district court's reasons need be," although "comparison with other cases is a useful tool." *Valtierra-Rojas,* 468 F.3d at 1240. As discussed above, a comparison of Jones's sentence with other cases reveals the divergence from the guidelines here was not extreme.

Jones does not argue that the sentencing court's reasons were not proper under § 3553(a). Nor do we have a situation where the district court abandoned the guidance afforded by the guidelines. *Cf. Hildreth*, 485 F.3d at 1129 ("[T]he District Court essentially ignored the recommendation of the sentencing Guidelines."). As we have stated:

> Although the sentencing Guidelines are now advisory, district courts must consider them in reaching sentencing decisions. As we have previously explained, the Guidelines are an expression of Congress's intentions in passing the sentencing laws. Consequently, a district court may not determine reasonableness under § 3553(a) without reference to the fact that the Guidelines represent a critical advisory aspect of the § 3553(a) factors. Moreover, a properly calculated Guidelines sentence will typically reflect an accurate application of the factors listed in § 3553(a), including the need to avoid unwarranted sentencing disparities under § 3553(a)(6), which we

have noted is the purpose of the Guidelines.

*Id*. at 1128-29 (citations and quotations omitted).

Due to ex post facto concerns, Jones was sentenced under the 2002 Guidelines manual rather than the manual in effect at the time of sentencing, the 2004 Guidelines manual.  While we offer no opinion as to whether the now-advisory guidelines require an ex post facto analysis, the current guidelines at the time of sentencing are instructive when reviewing a sentence for unreasonableness.[10]  *See United States v. Tisdale*, 7 F.3d 957, 967 (10th Cir. 1993).  The base offense level for Jones's offense was increased from 6 in 2002

---

[10]  *Compare United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006), *cert. denied*, 127 S.Ct. 3055 (2007) ("We conclude that the ex post facto clause should apply only to laws and regulations that bind rather than advise, a principle well established with reference to parole guidelines whose retroactive application is challenged under the ex post facto clause."); *United States v. Barton,* 455 F.3d 649, 655 n.4 (6th Cir.), *cert. denied*, 127 S.Ct. 748 (2006) (same); *and United States v. Rodarte-Vasquez*, 488 F.3d 316, 325 (5th Cir. 2007) (Jones, J., concurring) ("A purely advisory regulation does not present an *ex post facto* problem solely because it is traceable to Congress and will possibly disadvantage a defendant."); *with United States v. Carter*, 490 F.3d 641, 643 (8th Cir. 2007) ("[A]t least one of our sister circuits has held that the *ex post facto* clause does not apply to the now-advisory guidelines.  But in a case decided after *Booker,* we recognize[d] that retrospective application of the Guidelines implicates the *ex post facto* clause, though we took into account post-offense amendments to the guidelines when determining the overall reasonableness of the defendant's sentence.") (quotation and citation omitted) *and United States v. Gilman*, 478 F.3d 440, 449 (1st Cir. 2007) ("Although we note that the Court of Appeals for the Seventh Circuit has concluded that *Booker's* ruling that the guidelines are advisory rather than mandatory carries with it the elimination of ex post facto concerns, the issue is doubtful in this circuit.") (citation and quotation omitted).

to 10 in 2004.[11]  If the offense involved physical contact, the 2004 Guidelines

require an increase of three levels and if bodily injury was sustained, an

additional increase of two levels.  *See* USSG §2A2.4(a),(b)(1)&(2).

Consequently, Jones's base offense level under the 2004 Guidelines would have

been 30 to 37 months imprisonment.[12]

    We also are mindful that "[t]he sentencing judge has access to, and greater

familiarity with, the individual case and the individual defendant before him than

the Commission or the appeals court."  *Rita*, 127 S.Ct. at 2469.  Here, the

statutory maximum for these offenses was eight years for an assault resulting in

physical contact and twenty years for an assault resulting in bodily injury.  *See* 18

U.S.C. § 11(a)&(b).  The guideline range did not account for Jones's extensive

prison disciplinary history or the fact he was an inmate who attacked prison

officials.  "To affirm, we must simply be satisfied that the chosen sentence,

standing alone, is reasonable."  *United States v. Jarrillo-Luna*, 478 F.3d 1226,

1230 (10th Cir. 2007).  Given the above considerations, we do not find the

imposition of a thirty-six month sentence unreasonable.

---

[11]  The 2002 Guidelines were used pursuant to USSG §1B1.11(b)(1) which provides:  "If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."

[12]  The imposition of another two levels, one for each conviction on two counts, remained the same under both the 2002 and 2004 Guidelines.  *See* USSG §3D1.4(2002) and USSG §3D1.4 (2004).

B.     Motion for a New Trial

Jones's second motion for a new trial was based on his conversation with another inmate while waiting for his second sentencing hearing. The inmate, alleged he, too, suffered an unprovoked attack by Eichers while at Florence during the summer of 2003. Jones complains that had he known of this incident, he "could have used this information to effectively cross-examine Officer Eichers and undermined the credibility of the guards," which "could have changed the jury verdict." (R. Vol. I, Doc. 197 at 2.) In his reply brief to the trial court, Jones claimed: "This evidence was admissible, not only as [] impeachment after Officer Eichers took the stand, but as independent evidence under Fed. R. Evid. 404(b)." (*Id.*, Doc. 204 at 4.) Jones did not elaborate on this claim.

The court denied Jones's motion concluding the new evidence was merely impeachment evidence. The court also observed: "In his reply, Jones argues for the first time that evidence of the [inmate's] incident would have been admissible under Fed. R. Evid. 404(b) as independent evidence relevant to the affirmative defense of self-defense. Jones fails to provide any information from which I could determine that the . . . incident was similar enough to the facts of this case to be relevant for 404(b) purposes." (R. Vol. I, Doc. 242 at 3.)

Jones argues he "made a *prima facie* showing that the evidence was more than merely impeaching evidence" which "should be enough to obtain a ruling on the merits." (Appellant's Supp. Opening Br. at 4.) He asserts: "If the court

believed it needed more information, it should have asked the parties for it or set the motion for a hearing." (*Id*.) We disagree.

Rule 33(a) of the Federal Rules of Criminal Procedure authorizes district courts to grant new trials "if the interest of justice so requires." "A motion for a new trial based on newly discovered evidence is generally disfavored and should be granted only with great caution." *United States v. Gwathney*, 465 F.3d 1133, 1143 (10th Cir. 2006) (quotations omitted), *cert. denied*, 127 S.Ct. 2151 (2007). "To procure a new trial based on newly discovered evidence . . . the defendant must show:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id*. at 1144 (quotations omitted). We review the denial of a motion for a new trial for abuse of discretion. *United States v. Quintanilla,* 193 F.3d 1139, 1146 (10th Cir. 1999).

We find no abuse of discretion here. The court carefully and thoroughly reviewed the proffered evidence (even though it was unaccompanied by an affidavit) and reached a reasonable conclusion. Jones did not explain his Rule 404(b) theory to the court nor does he do so on appeal.[13] We also note his

---

[13] Rule 404(b) of the Federal Rule of Evidence provides in relevant part: Evidence of other crimes, wrongs, or acts is not admissible to prove

-43-

argument on appeal fails to contain any citation to supporting legal precedent.

We require more than bare conclusions. *See United States v. Hall*, 473 F.3d 1295, 1313 n.5 (10th Cir. 2007) (stating failure to meaningfully develop arguments will forfeit them on appeal); *see also Barkell v. Crouse*, 468 F.3d 684, 696 (10th Cir. 2006) ("We have consistently held that we will not consider claims unsupported by cogent argument and authority.").

**AFFIRMED.**

ENTERED FOR THE COURT

Terrence L. O'Brien
Circuit Judge

the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake . . . .

Jones fails to provide any analysis of this provision and even fails to identify the purpose for which he would use the Rule 404(b) evidence.

No. 05-1329, 06-1105, <u>United States v. Robert Jerome Jones</u>

**ANDERSON**, Circuit Judge, concurring:

I concur in the result reached by the Order and Judgment.